THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER ABERNATHY, Defendant-Appellant.

First District (3rd Division)   No. 1—87—0605

Opinion filed September 20, 1989.

294

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Following a jury trial, defendant, Christopher Abernathy, was found guilty of the murder, attempted aggravated criminal sexual assault, aggravated criminal sexual assault, and armed robbery of Kristina Hickey. Defendant was sentenced to a term of natural life imprisonment for the murder, 30 years' imprisonment for the armed robbery and 30 years' imprisonment for the aggravated criminal sexual assault. The trial court merged the conviction of attempted aggravated criminal sexual assault into the conviction for aggravated criminal sexual assault.

Defendant appeals his conviction and sentence on the following grounds: (1) the trial court erred in denying his motion to suppress statements; (2) the trial court unduly restricted the defense's cross-examination of a key State witness; (3) the trial court erred in allowing the State's Attorney to show a videotape of Kristina Hickey to the jury; (4) certain remarks made by the State's Attorney in closing argument constituted reversible error; (5) the trial court erred in refusing to instruct the jury on involuntary manslaughter; (6) the trial court erred in imposing a sentence of natural life imprisonment; and (7) the Illinois penalty statutes for murder violate the due process and equal protection clauses of the United States and Illinois Constitutions. We affirm defendant's conviction and sentence.

The facts adduced at the hearing on defendant's motion to suppress statements and at trial follow.

MOTION TO SUPPRESS STATEMENTS

Anne Kolus, defendant's mother, testified that defendant has a

learning disability. Defendant received average or just below average grades in grammar school and in high school. He dropped out of high school in his sophomore year because he could not understand the school work.

On cross-examination, Mrs. Kolus testified that in November of 1985, defendant was employed at a restaurant where he was learning to be a cook. Defendant has been able to perform tasks such as driving a car and maintaining employment.

Defendant testified that he was arrested in Mokena, Illinois, at approximately 1 p.m., on November 30, 1985. While at the Mokena police station, he asked Detective Kuester for an attorney. Later that day, he was transported to the Park Forest police station. Defendant also testified that he was taken to court on December 2, 1985, at which time an attorney was appointed for him. Between November 30 and December 2, 1985, he was not given the *Miranda* warnings. He was told that an attorney would be appointed for him. However, an attorney was not appointed for him during the questionings even though he had been asking for an attorney ever since his arrest.

Defendant testified that prior to November 30, 1985, he had been arrested for shoplifting but not for any felony offense.

On cross-examination, defendant was able to recite the *Miranda* warnings and explain what the right to remain silent means. He claimed that he had learned the *Miranda* warnings from watching television while in jail. Prior to his incarceration, he did not know the *Miranda* warnings because he never had time to watch television.

Defendant could not remember being given the *Miranda* warnings by Detective Kuester at the Mokena police station. On the way to Park Forest, the discussion centered on the best route to take to Park Forest. Detective Kuester did not discuss the death of Kristina Hickey with him. Once they arrived at the Park Forest police station, he was placed in a room where he was interviewed by Detective Kuester. Detective Kuester did not give him his *Miranda* warnings. Defendant could not remember signing a document dated November 30, 1985, in which he acknowledged that Detective Kuester had given him the *Miranda* warnings (hereinafter the waiver form). Defendant explained that Detective Kuester had made him sign a lot of papers, and he identified the waiver form as a document that Kuester had made him sign.

Defendant was able to read the waiver form at the hearing. The form contained the *Miranda* warnings and questions after each warning regarding whether defendant had understood the warning. In answer to each question on the form, defendant had indicated that he

understood the warning given. However, defendant testified at the hearing that he did not understand the following warning: "Knowing these rights, you are willing to answer questions without first speaking to a lawyer." The form also contained the following questions and answers:

"Q. Prior to talking to me, did anyone strike you or force you to answer questions.

A. No.

Q. Prior to talking to me, did anyone make threats that anything would happen to you if you did not answer questions.

A. No.

Q. Prior to talking to me, did anyone promise you anything or offer you any reward of any type for answering questions.

A. No."

Defendant testified that he made a statement to Detective Kuester after signing the waiver form. He also gave Detective Kuester permission to take hair and other samples from his body as well as to search his car. He was not forced to sign the voluntary release forms for the samples. Detective Kuester then stopped questioning him. He was given dinner and taken to the lockup for the night.

Defendant testified that the morning after his arrest, Detective Kuester did not question him regarding Kristina Hickey's death. That afternoon, however, Detective Kuester told him that he had talked to several people that defendant had mentioned in the November 30, 1985, statement. Defendant told Detective Kuester that he had told him the truth and agreed to take a polygraph test. Detective Kuester then stopped the questioning. Later that afternoon, defendant was taken to the polygraph examiner's office where he asked to have an attorney appointed for him. Defendant testified, however, that he wanted to take the polygraph test. He signed a form waiving his constitutional rights because he wanted to take the test.

After the polygraph test, defendant talked with Detective Kuester in the polygraph examiner's office. Defendant testified that Detective Kuester did not give him the *Miranda* warnings at any time during this conversation. Detective Kuester "made him talk" about Kristina Hickey's death. He gave Detective Kuester a written statement regarding the circumstances of Kristina's death and was taken back to the Park Forest police station.

Defendant testified that, later that night, he talked to a State's Attorney who gave him the *Miranda* warnings for the first time. He was given the *Miranda* warnings a second time in the presence of a court reporter. He understood his constitutional rights a "little, but

not all the way." He did understand that he had a right to an attorney and that he did not have to say anything if he didn't want to. However, he answered the State's Attorney's questions because "they weren't giving [him] one." He was then taken to the lockup.

Defendant testified that he cooperated with the police the whole time that he was in custody because he had nothing to hide. Defendant was then asked the following questions:

"Q. What did Kuester ever tell you to make you give a statement against your will?

A. That I could go home.

Q. He told you that if you confessed to the murder of Kristina Hickey, he would let you go home?

A. In a way, yes.

Q. What were his words that he used, sir?

A. I can't remember the exact words he used."

On redirect examination, defendant testified that he was upset and frightened at the time of his arrest. He did not understand the need to have an attorney represent him. The word "will" in the sentence "an attorney will be appointed for you" means "in the future."

On re-cross-examination, defendant was asked: "How could you ask for a lawyer, if you didn't know you needed one?" Defendant replied: "I always watched—when I was outside, I would watch maybe TV once in a while."

Detective Carl Kuester testified that at, approximately 1 p.m., on November 30, 1985, he was told that defendant had been detained by the Mokena police department. He drove to the Mokena police station to transport defendant to the Park Forest police station. While at the Mokena police station, he advised defendant of his constitutional rights. Defendant indicated that he understood his rights. Detective Kuester then requested that defendant accompany him to the Park Forest police station. At the Park Forest police station, he placed defendant in the detective office. Defendant was not handcuffed. At approximately 4:05 p.m., he advised defendant of his constitutional rights for the second time. Defendant signed a waiver form indicating that he understood his rights. Defendant did not ask him for an attorney nor did defendant indicate that he wanted to remain silent. He then interviewed defendant. Defendant was fed and placed in a cell for the night at about 8 p.m. or 9 p.m.

Detective Kuester testified that in the afternoon of December 1, 1985, he talked with defendant regarding Kristina Hickey's death. He pointed out certain discrepancies between the results of his investigation and what defendant had told him the day before. Defendant vol-

unteered to take a lie detector test or to take a truth serum. Detective Kuester drove defendant to Theodore Polygraph Service, where defendant took a polygraph test after he was advised of his constitutional rights. After the test, he told defendant his constitutional rights and talked with defendant regarding Kristina Hickey's death. Defendant gave him an oral statement regarding Kristina Hickey's death which defendant then reduced to writing.

Detective Kuester testified that later that evening the State's Attorney advised defendant of his rights and defendant made first an oral statement and then a statement that was recorded by the court reporter. Detective Kuester further testified that defendant never asked for an attorney or refused to talk. Defendant cooperated with the police during the entire investigation.

The parties then stipulated that on December 1, 1985, Assistant State's Attorney Paul Perry advised defendant of his constitutional rights after which defendant made an oral statement regarding Kristina Hickey's death. A court reporter then read the *Miranda* warnings to defendant. Defendant indicated that he understood each warning and gave a statement that was recorded by the court reporter.

TRIAL TESTIMONY

Patricia Hickey, Kristina Hickey's mother, testified that in the fall of 1984, Kristina was a sophomore at Rich East High School and sang in the school choir. On the evening of October 3, 1984, Kristina walked to school at 6:30 p.m., to sing in a choir concert. She was wearing a pink and white striped dress, pink and white jewelry, a mauve raincoat, a grey corduroy purse and grey shoes. Patricia Hickey asked Kristina if she wanted a ride after the concert, and Kristina indicated that she would rather walk home. The high school was less than a mile from Kristina's home and Kristina usually walked to and from school. Patricia Hickey urged Kristina to come home immediately after the concert and she promised to do so. Kristina did not come home that night, however. Patricia Hickey next saw Kristina's body at the funeral home.

Patricia Hickey identified the clothing that Kristina wore on October 3, 1984. She testified that the clothing was in good condition when Kristina left for the concert. She also identified pieces of a grey corduroy purse that had been recovered by the police.

Douglas Ulreich, the choral music director at Rich East High School, testified that Kristina was a member of the sophomore choir at the school. On October 3, 1984, the choir gave a concert at the school in which Kristina participated. The concert was videotaped. Mr.

Ulreich identified Kristina in the videotape. Her face and her dress as seen in the videotape were an accurate portrayal of the way Kristina looked between 7:30 p.m. and 9 p.m. on October 3, 1984. The concert ended at 9 p.m. At 9:15 p.m., Mr. Ulreich saw Kristina using the telephone outside the athletic director's office in the school. Mr. Ulreich attended Kristina's funeral on October 9, 1984.

It was stipulated that if Nancy Kruez, a security agent for Marshall Field's in Park Forest, was called to testify she would state that the parking lot lights and the exterior building lights of the Marshall Field's store were inoperative on October 3, 1984, and that the area was extremely dark.

Police officer Geoffrey Henderson of the Park Forest police department testified that on October 5, 1984, he responded to an assignment to assist a police unit at Marshall Field's. When he arrived at Marshall Field's, he was directed to some bushes east of Marshall Field's entry door, where he saw Kristina's body. The body was not visible from the entry door because of the bushes, the lighting conditions, and the slope of the hill leading from the entry door to the bushes.

Alan Kulovitz, an evidence technician with the Cook County sheriff's police department, testified that on October 5, 1984, he investigated a crime scene at Marshall Field's. He took several photographs of the crime scene which accurately portray the crime scene and Kristina's body. He also examined Kristina's body and observed a gaping wound in the center of the throat area and a stab wound in the center of the chest just to the right of the left breast. He was able to determine from the pattern of blood from the chest wound that Kristina's body was in the same position as when death occurred. He also observed that Kristina's dress had been torn and folded in such a way that the left side of the chest, from the navel to the shoulder, was exposed while the right side was covered. The left side of the dress did not have blood on it, an indication that it had been folded back before the chest wound was inflicted.

Mr. Kulovitz further testified that the left cup of Kristina's bra had been cut away, the strap had been cut and the bra had been pushed up around her neck. Kristina was also wearing panties, nylons and high heeled shoes at the time of her death. The nylons and panties had been pulled down to her ankles. The dirt in the area surrounding her feet had been churned up from a back and forth, thrashing movement of her legs, feet and shoes. Her right foot had buried itself in a mound of dirt created by that movement. Mr. Kulovitz testified that the mound of dirt indicated that Kristina was struggling with her

assailant, and the location of Kristina's right foot indicated that she died where she was found. Further, there was evidence of postmortem lividity[1] on Kristina's posterior and on the back of her legs, another indication that Kristina was on her back at the time of her death and that her body had not been moved.

Mr. Kulovitz observed that Kristina's arms were behind her back and that her right arm was held in that position with the belt from her coat. Several personal items from Kristina's purse were found underneath her body.

Dr. Eupil Choi, a pathologist employed by the Cook County medical examiner's office, performed an autopsy on Kristina's body on October 6, 1984. His testimony coincided with Mr. Kulovitz's regarding Kristina's clothing and the belt wrapped around her right wrist. In addition, he testified that he found areas of bruising on the external aspect of her genitalia and on the labia. Samples taken from her vagina tested negative for the presence of spermatozoa. Dr. Choi also found bruises on the back of Kristina's left arm and on her ankle and an abrasion on the back of her right arm. He observed a single, deep slash wound, six inches in length, over the front of the neck and extending from side to side. There was a complete transection of the throat, the trachea and the esophagus. There were also five abrasions over the right side of her face which were probably caused by her face being struck against an object. There were multiple abrasions and skin bruisings on the left side of the neck and collar bone and over the left jaw. The bruises on the left side of the neck and collar bone were consistent with someone kneeling on her shoulder and neck but could also have resulted from being struck with some object. The bruise on the left jaw, which was three inches wide, was consistent with her head being slammed against a hard surface. Dr. Choi also found blood between Kristina's scalp and her skull, consistent with her head being struck against a hard surface. Lastly, there were two stab wounds on Kristina's chest. One of the wounds was superficial, and the other was deeper.

It was Dr. Choi's opinion that the chest wounds were inflicted first and that Kristina died very quickly after the transection of her neck. The wounds were inflicted with a sharp instrument like a knife.

On cross-examination, Dr. Choi testified that he did not know

---

[1]Mr. Kulovitz explained that postmortem lividity is the settling of the blood in various parts of the body following death. Once the heart stops functioning, the blood ceases to circulate through the body. Instead, through the force of gravity, the blood settles to the lower portions of the body.

whether Kristina had been sexually penetrated. On redirect examination, Dr. Choi explained that some object did bruise the interior of Kristina's vagina although he did not know the nature of the object.

Carol Dorsett, a staff photographer for Star Newspapers, was assigned to do a story on Kristina's funeral. Ms. Dorsett testified that on October 9, 1984, defendant approached her outside the funeral home and told her that he had dated Kristina, that he loved Kristina and that he would have done anything for Kristina. During the conversation, Ms. Dorsett noticed that defendant had scratches on his nose and lip. Defendant told her that he was injured when he ran into a tree. Defendant then told her that he had an M-16 in the trunk of his car and that he would fire the weapon at the funeral. Ms. Dorsett talked to a co-worker about defendant's threat and the co-worker called the police. Police officers then searched defendant and defendant's car but did not recover any weapon.

Gerald E. Gordon, an employee of the Department of Public Works for the Village of Park Forest, testified that on October 10, 1984, he was cutting the grass on the ditch banks in an area near the location where Kristina's body was discovered, when he found Kristina's social security card and a brown wallet containing other identification cards.

Mr. Gordon directed police officer Francis DioGuardi to the location where he discovered the social security card and wallet. Officer DioGuardi conducted a search of the area and found several cosmetic articles, shredded pieces of an address book, shredded pieces of a grey corduroy purse, a slip and some miscellaneous articles. The purse had been shredded by the mowing machine.

Alan Dennis testified that he has known defendant since 1983. In the summer of 1985, he asked defendant if he was responsible for Kristina's death. Defendant answered yes and started crying. Mr. Dennis testified that he did not contact the police regarding defendant's admission. However, on November 21, 1985, Detective Kuester talked with him regarding Kristina's death and he told the detective about defendant's admission.

On cross-examination, Mr. Dennis admitted that in August of 1983, he beat defendant using karate sticks and his fist. He also kicked defendant in the head and in the rib cage. He knew that defendant was hospitalized in 1983, but he did not know the reason for the hospitalization.

Detective Carl Kuester testified that on November 21, 1985, he spoke with Alan Dennis regarding Kristina's death. He then prepared a flyer in which he described defendant and defendant's car and

stated that defendant was wanted as a subject in the investigation of Kristina's death. He gave a copy of the flyer to Sergeant Dunnagan of the Mokena police department, who arrested defendant on November 30, 1985. Detective Kuester transported defendant to the Park Forest police department, where he found two cards in defendant's wallet. One card indicated that funeral services were being held for Kristina. The other card had the following message printed on it: "I am so sorry for what I did. I still love you. Christopher Abernathy."

Detective Kuester further testified that defendant signed a form indicating that he understood and waived his constitutional rights. He then talked with defendant regarding Kristina's death. He asked defendant if he was in Park Forest the first week of October 1984, and defendant indicated that he was not. He then asked defendant where he was on October 3, 1984. Defendant told him that he was at home in Midlothian until mid afternoon when he picked up Denice Kuba from Breman High School and spent the afternoon and evening at her house. Defendant stated that he returned home at 10:15 p.m. Defendant's work records indicate, however, that defendant worked from 10 a.m. until 3 p.m. on October 3, 1984.

Subsequently, defendant gave the following written account of his whereabouts on October 3, 1984, to Detective Kuester:

"I asked my friend, Tony, to take me out to Park Forest to see some friend. I went to Jewel's to get me something to eat. I got a Twinkie and a can of pop. Then I see Kris walk by herself, so I walked up to her and she was crying at the time. I asked her what was worry, she said she got into a fight with her boyfriend. I asked her why, she said it was not any of my business at all, so I said to her if she wants me to walk her home and she said, yes, please. Then she started to get upset more, then she hit me and I grabbed her arms at the time, I had a knife with me. I had it in my hand at the time that I was holding her. She pulled away from me. I think that I could have hit her with my open hand. Then I grabbed her again, I still had the knife in my right hand in front of her, then tried to pull her arms up in front of her. She put my hands by her neck, then I said something to her, I can't remember what I said to her. She turned her neck and then I accidentally cut her neck. I took my picture from her, then I ran to Mickey D's, then I went to the park for awhile, then I went and called Tony to pick me up and then I went home."

Assistant State's Attorney Paul Perry testified that on December 1, 1985, defendant made an oral statement admitting his involvement

in Kristina's death. Defendant later agreed to give a court-reported statement in which he admitted killing Kristina. Defendant said that he had known Kristina for about a year before her death. On October 3, 1984, he saw Kristina in the vicinity of the Park Forest Plaza. Kristina was crying. Defendant asked her what was wrong. She said she had had a fight with her boyfriend. Defendant asked her the reason for the fight, and she replied that it was none of his business. Defendant then asked her if she wanted him to walk her home and she said yes. As they were walking, defendant kept asking her about the fight. She became upset and hit him. He pushed her "like to cheer her up." They started arguing. They were next to the Marshall Field's store when "[he] might have hit her without realizing it. Then [he] probably accidentally knocked her down." He "got on top of her," pushed her dress up and pulled her panties down. He was trying to have sex with her. He had a butterfly knife with a three or four inch blade in his hand. "[He] had her pinned. [He] didn't realize the knife was in [his] hand at the time. Then she was struggling. Then [he] might have, without realizing, stabbed her once or twice" in the chest. She threw him off and he got back on her. He pinned her arms to her chest. "Then she tried to pull her hands away and instead of pulling, she pushed them up. Then she turned her head suddenly and [he] might have cut her" neck "on accident." He grabbed her purse and her slip, took his picture out of the purse and threw the purse and the slip away. Two days later, he was treated at South Suburban Hospital for injuries to his face, chest, ribs and arm that he suffered when he ran into a tree.

DEFENSE WITNESSES

Ann Kolus, defendant's mother, testified that defendant was hospitalized in August of 1983, at St. James Hospital in Chicago Heights. Defendant was treated for bruises in the back of the head and in the rib area and was discharged that same day. Defendant was also hospitalized on October 5, 1984, and was treated for facial cuts and other bruises. Defendant was discharged on October 6, 1984.

Lisa Wrobel testified that she met defendant after school on October 3, 1984. They went to her grandmother's house in Midlothian, where they cut the lawn and ate dinner. Defendant left at approximately 11:30 p.m.

On cross-examination, Lisa testified that after dinner she went to Denice Kuba's house with defendant, where they stayed until 9:30 p.m. They then returned to Lisa's grandmother's house. Lisa also testified that she talked with Detective Kuester twice in December of

1985, but she did not tell him that defendant was with her on October 3, 1984. In the second meeting in December, she went to Marshall Field's with Detective Kuester and showed him the location where Kristina's body had been found. She was able to do this because defendant had shown her the location the day of Kristina's wake.

Virginia Wrobel, Lisa's mother, testified that Lisa dated defendant from July until December 1984. Lisa did not go to school on October 3, 1984. Instead, Lisa went to town, where she met defendant. Lisa and defendant arrived at Lisa's grandmother's house between 3:30 p.m. and 4 p.m. Lisa and defendant left the house between 6:30 p.m. and 7 p.m., but returned at 10 p.m. They sat on the porch until 11:30 p.m., when defendant left.

REBUTTAL WITNESSES

In rebuttal, Denice Kuba testified that Lisa Wrobel and defendant were not at her house on October 3, 1984. Detective Kuester testified that he talked with Lisa Wrobel twice in December 1985. Lisa told him that she saw defendant on October 1 and on October 5, 1984. She told him that she did not see defendant on October 3, 1984.

OPINION

MOTION TO SUPPRESS

Defendant first contends that the trial court erred in failing to suppress his oral and written statements. Specifically, he asserts that in light of his youth, limited intelligence, and inexperience with the law, he did not knowingly and intelligently waive his constitutional rights. He also asserts that the oral and written statements were induced by Detective Kuester's "promise" that he would be allowed to go home if he confessed. Since we agree with the trial court that defendant was advised of his constitutional rights and that he voluntarily waived the same, we must reject defendant's contention.

■■ In *People v. Clark* (1986), 114 Ill. 2d 450, 457, 501 N.E.2d 123, the Illinois Supreme Court explained the standard that must be used in determining whether a statement is voluntary:

"Whether a statement is voluntarily given depends upon the totality of the circumstances. The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 70.) The voluntariness of a confession, under ordinary circumstances, only needs to be estab-

lished by a preponderance of the evidence. (*Lego v. Twomey* (1972), 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619; *People v. Jackson* (1968), 41 Ill. 2d 102, 109.) The trial court's finding that a statement was voluntary will not be disturbed unless the finding is contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 70."

■ In the present case, there is ample evidence in the record to support the trial court's finding that the statements made by defendant were voluntary. Detective Kuester testified that he advised defendant of his constitutional rights on three occasions and that on each occasion defendant indicated that he understood his rights. Detective Kuester also testified that the polygraph examiner advised defendant of his rights. Assistant State's Attorney Paul Perry and the court reporter advised defendant of his rights prior to taking his statements. Additionally, defendant signed two waiver forms in which he acknowledged that he had been advised of his rights and that he understood his rights. Thus, it is clear that defendant was advised of his rights on a number of occasions and indicated that he understood his rights.

It is also clear from the record that defendant wanted to cooperate with the police. Detective Kuester testified that defendant never requested to have an attorney appointed for him and never refused to answer questions. Defendant volunteered to take a polygraph test or a truth serum test. Defendant also signed releases giving Detective Kuester permission to search his car and to take hair and other samples from his body. Detective Kuester testified that defendant cooperated during the entire investigation. This testimony was corroborated by defendant's statement at the hearing on the motion to suppress that he cooperated with the police the whole time he was in custody because he had nothing to hide.

Lastly, it is clear from the record that defendant understood his rights and voluntarily waived the same. We have noted above that defendant signed two waiver forms indicating that he understood his rights and that he told Detective Kuester, the polygraph examiner, the court reporter and Assistant State's Attorney Paul Perry that he understood his rights. In addition, defendant testified at the hearing that he understood his constitutional rights a "little, but not all the way." He explained that he understood that he had a right to an attorney and that he did not have to say anything if he didn't want to.

Defendant was very articulate at the hearing on the motion to suppress. He understood the questions that were posed to him and he answered without hesitation. He was able to read the waiver forms

that he had signed with little difficulty. His demeanor at the hearing supports the trial court's finding that his statements were voluntary.

■ We are aware of defendant's inexperience with the law and of his youth.[2] However, defendant's age and inexperience with the law are just two of the factors to be considered in determining whether a statement is voluntary, and we cannot say upon this record that the trial court erred in denying the motion to suppress. See *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 476 N.E.2d 1179 (defendant was 16 years old at the time of his arrest); *People v. Eckles* (1984), 128 Ill. App. 3d 276, 470 N.E.2d 623 (19-year-old defendant); *People v. Allen* (1983), 116 Ill. App. 3d 996, 452 N.E.2d 636 (defendant was 19 years old and had never been arrested before), *aff'd in part, rev'd in part on other* grounds (1985), 109 Ill. 2d 177.

Defendant asserts that he is of limited intelligence and could not voluntarily waive his constitutional rights. He directs our attention to his mother's testimony that he has a learning disability and that he dropped out of high school because he could not understand the work.

We held in *People v. Gore* (1983), 116 Ill. App. 3d 780, 785, 452 N.E.2d 583, that "[a] subnormal mentality does not *ipso facto* make a confession involuntary where the subnormality has not deprived the defendant of the capacity to understand the meaning and effect of his confession." We have also held that the trial court is in a better position than a court of review to evaluate a defendant's ability to understand his rights. (*People v. Burke* (1987), 164 Ill. App. 3d 889, 896, 518 N.E.2d 372.) In the present case, the trial court observed:

> "Now, when the matter comes to court, we have the situation where the defendant indicates he doesn't understand. But in hearing the defendant, listening to him testify, listening to the testimony of the officer, the Court is of the opinion that the defendant did understand what was being told to him, but it would appear that perhaps the defendant may have felt that he could outwit the officer."

Our review of the record leads us to agree with the trial court that defendant's "limited intelligence" did not deprive him of the capacity to understand his constitutional rights and the effect of his statements. See *People v. Burke*, 164 Ill. App. 3d at 895-98 (trial court found that the defendant, who had an IQ of 62 and other mental impairments, understood his rights and the consequences of waiving them); *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 501 N.E.2d 207 (defendant's age, intelligence (IQ score of 75), and education did

---

[2] Defendant turned 19 the day after his arrest.

not render defendant's statement involuntary); *People v. Racanelli*, 132 Ill. App. 3d at 132-34 (16-year-old defendant with an IQ of 54 knowingly and voluntarily waived his rights); *People v. Eckles*, 128 Ill. App. 3d at 279 (trial court found that the defendant, who had a ninth-grade education, voluntarily and knowingly waived his rights); *People v. Allen*, 116 Ill. App. 3d at 1011 (knowing and voluntary waiver made by defendant who had completed only the eighth grade).

Defendant also maintains that the statements should be suppressed because they were induced by Detective Kuester's "promise" that he would be allowed to go home if he made a statement. We note that defendant could not remember the words used by Detective Kuester in making the alleged promise. Moreover, defendant signed a waiver form in which he acknowledged that no promises had been made to him. Defendant also stated in his court-recorded statement that no one had promised him anything in return for the statement. Again, we cannot say that the trial court erred in finding that the statements were voluntary.

Citing *Miller v. Fenton* (1985), 474 U.S. 104, 88 L. Ed. 2d 405, 106 S. Ct. 445, defendant claims that he is entitled to *de novo* review of the trial court's conclusion that the statements were voluntary. We rejected a similar argument in *People v. Fisher* (1988), 169 Ill. App. 3d 915, 923, 523 N.E.2d 1119.

■ As noted above, in *People v. Clark* (1986), 114 Ill. 2d 450, 501 N.E.2d 123, the Illinois Supreme Court applied the "manifest weight of the evidence" standard in determining whether a statement was voluntary. Our supreme court has not demonstrated any intention to substitute *de novo* review for the "manifest weight of the evidence" standard (see *People v. Evans* (1988), 125 Ill. 2d 50, 76-77, 530 N.E.2d 1360 (a case postdating *Miller v. Fenton* which holds that a trial court's finding that a statement was voluntary will not be disturbed unless it is against the manifest weight of the evidence)), and we decline to do so.

CROSS-EXAMINATION OF DENNIS

■ Next, defendant contends that the trial court unduly restricted cross-examination of Alan Dennis, a witness for the prosecution. Specifically, defendant claims that he was not allowed to explore Alan Dennis' probationary status. We have examined the record and we find that defendant's contention has no basis. Alan Dennis gave a written statement to the police admitting that he had broken into six garages. In July or August 1985, Alan Dennis was found guilty of a burglary and sentenced to probation. The State chose not to prose-

cute Alan Dennis for the other incidents. At defendant's trial, the State's Attorney made a motion *in limine* to limit cross-examination of Alan Dennis regarding the circumstances of the burglary for which he had been convicted. The State's Attorney presented his motion as follows:

"[State's Attorney]: Judge, we are going to make a motion in limine that during the cross examination of Dennis Allen we—.
*   *   *

I believe on cross examination [defense counsel] will seek to bring out that he has, in fact, been convicted of burglary in this courtroom, and I have no objection to that and I will stipulate to it, but I believe you have a provable, don't you, [defense counsel]?

[Defense counsel]: He received two years probation.

[State's Attorney]: We'll stipulate to that.

[State's Attorney]: We will stipulate to whatever he has and he can read it into the record on cross examination. The motion *in limine* I am presenting at this time, though, is that he be permitted to go no farther [*sic*] into it, neither into the facts or circumstances arising around that burglary, nor to anything that the defendant [Alan Dennis] might have said with regards to that burglary because, in fact, impeachment is useful only to show a lack of believability based upon prior criminal convictions and it is not used to show any propensity towards being a criminal or for any other purpose, Judge."

Defense counsel argued to the trial court that he should be allowed to question Alan Dennis regarding Dennis' statement that he had broken into six garages. The trial court ruled as follows:

"THE COURT: They never charged him [with the five other burglaries]. He was charged with one [burglary] and plead [*sic*] guilty to it. The fact he may have confessed to any number of things is not going to be allowed in, period.
*   *   *

[Defense counsel]: But he confessed to them.

THE COURT: Well, I'm not going to allow it. You have a right to go into the conviction where he was found guilty on a plea of guilty and he's been convicted of a charge of burglary. That certainly should raise sufficient question as far as the jury is concerned as to, you know, his credibility as a witness. But as far as signing a confession to those other things—unless you can tie in to show that he may have had some favorable treatment in those matters as a result of his testifying for the po-

lice, or giving information to the police."
Thus, the trial court held that defense counsel should be able to cross-examine Alan Dennis regarding his conviction for burglary, but not his confession to the other five burglaries.

The record clearly shows that the State's Attorney was not seeking to restrict cross-examination regarding Alan Dennis' probationary status. To the contrary, the State's Attorney indicated that he was willing to stipulate that Alan Dennis had been sentenced to probation. It is also clear from the record that the trial court did not prohibit cross-examination of Alan Dennis regarding his probationary status. Defendant's contention that he was denied the right to cross-examine Alan Dennis regarding his probationary status is based upon a complete distortion of the record.

### VIDEOTAPE OF VICTIM

Next, defendant maintains that the trial court erred in allowing a videotape of Kristina Hickey to be admitted in evidence. Defendant claims that the videotape was irrelevant and highly prejudicial. We disagree.

In *Missouri Portland Cement Co. v. United Cement, Lime, Gypsum & Allied Workers International Union* (1986), 145 Ill. App. 3d 1023, 1027, 496 N.E.2d 489, we discussed the admissibility of videotapes into evidence:

> "Illinois courts have established that motion pictures are considered admissible on the same basis as photographs and as such the principal question being of relevancy. (*Department of Public Works & Buildings v. Oberlaender* (1968), 92 Ill. App. 2d 174, 190, 235 N.E.2d 3, 12, *aff'd* (1969), 42 Ill. 2d 410, 247 N.E.2d 888.) Further, the admission of photographs or videotape is within the discretion of the trial court, and will not be reversed absent an abuse of discretion. (*Pace v. McClow* (1983), 119 Ill. App. 3d 419, 427, 458 N.E.2d 4, 10.) In line with the court's rule in *Pace*, a videotape can be admitted into evidence if it is identified by a witness as a portrayal of certain facts relevant to a particular issue and is verified by that witness with personal knowledge as a correct representation of these facts. Verification may be furnished by the testimony of any competent witness who has sufficient knowledge to testify that the videotape fully represents what it purports to portray."

The videotape at issue was introduced during the testimony of Douglas Ulreich, the choral music director of Rich East High School. Mr. Ulreich testified that Kristina Hickey was a member of the choir

and participated in a choir concert on October 3, 1984. Mr. Ulreich also testified that the concert was videotaped and that Kristina Hickey's face and dress were accurately portrayed in the videotape. Thus, the videotape illustrated Mr. Ulreich's testimony regarding Kristina Hickey's appearance on the night that she was killed.

The videotape also established several facts at issue. First, it established Kristina Hickey's whereabouts immediately before her death. Second, it showed the condition of her clothes immediately before her death. A comparison of her clothes before her death and after supported the inference that she was sexually assaulted. Lastly, the videotape was probative of identity and life and death. See *People v. Bunch* (1987), 159 Ill. App. 3d 494, 511-12, 512 N.E.2d 748 (photograph of victim before her death properly used for identification and proof of life and death); *People v. Toth* (1982), 106 Ill. App. 3d 27, 34, 435 N.E.2d 748 (photograph of victim accurately depicted what she looked like on the day of her death and illustrated the testimony of her husband).

■ Defendant maintains that the videotape was irrelevant because Kristina Hickey's identity and appearance were not at issue. We find no merit in this argument. Videotapes and photographs are admissible even where defendant does not refute the victim's identity. (*People v. Williams* (1985), 137 Ill. App. 3d 736, 744, 484 N.E.2d 1191.) Further, videotapes and photographs may be properly admitted to corroborate testimony despite defendant's offer to stipulate as to matters shown therein. *People v. Williams*, 137 Ill. App. 3d at 744.

Defendant also maintains that the videotape was prejudicial. The jury was shown a segment of the videotape that lasted approximately one minute. Moreover, the videotape was introduced during the testimony of the choir director and served to illustrate his testimony. The videotape was also relevant to prove various facts at issue. Under these circumstances, we cannot say that the "prejudicial effect" of the videotape outweighed its probative value. Nor can we say that the trial court abused its discretion in admitting the videotape in evidence.

PROSECUTORIAL MISCONDUCT

Next, defendant maintains that he was denied a fair trial because of prosecutorial misconduct during closing argument. Defendant complains of the following remarks:

"[State's Attorney]: Again the question comes back as to why did he do it. You know, all of you know now why this man killed Kristina Hickey as he explains to you in only his third

and fourth statements, that being the oral statement to Paul Perry and to Carl Kuester and the court-reported confession to those same two people. He did it because she rejected his sexual advances. He wanted to have sex with her. She said no. Well, there are some people in this world, a great many of them, who will go and have sex casually, who will go with anybody, Abernathy and anybody else, and they can come parading in our courtroom and testify. They can do all these things. But certain people don't do that. Certain people are brought up right. Certain people come home at night and don't play hooky. Those people unfortunately sometimes pay with their very lives for their being brought up that way. Sometimes that is demanded of them when somebody demands things from them that they would rather die than give up what that man was trying to take from her, and that is exactly what happened here, ladies and gentlemen, and you hear that in his statements and you can see that in the physical evidence."

Defendant contends that these remarks were references to Kristina Hickey's virginity and were highly inflammatory.

 Initially, we note that defendant did not object to these remarks at trial.[3] Thus, defendant has waived review of the alleged error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274; *People v. Surles* (1984), 126 Ill. App. 3d 216, 225, 466 N.E.2d 1295.) Moreover, review is not mandated by the plain error doctrine because the evidence of defendant's guilt is overwhelming, and the alleged error is not so prejudicial that justice has been denied. *People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618; *People v. Surles*, 126 Ill. App. 3d at 225.

Citing *People v. Sales* (1986), 151 Ill. App. 3d 226, 502 N.E.2d 1221, defendant asserts that the alleged error was such as would prevent a fair trial. In *People v. Sales*, the prosecutor remarked in closing argument that " 'Roger Sales [the defendant] put his penis into [the complainant] and took her virginity.' " (*People v. Sales*, 151 Ill. App. 3d at 231.) The prosecutor also suggested to the jury that

---

[3]We are aware that at the end of closing arguments defendant moved for a mistrial based upon inflammatory remarks made by the prosecution. However, in the motion for mistrial, defendant referred only to remarks made by Assistant State's Attorney Konczal during the opening segment of the State's closing argument. The remarks at issue in this appeal were made by State's Attorney Quinn during the rebuttal segment of the State's closing argument.

the crime was racially motivated and that the defendant's homosexuality could be used as evidence of his guilt. Although the defendant failed to object to the prosecutor's remarks, the appellate court reviewed the issues on the merits. The court found that the prosecutor's comments were improper. The court also found that the evidence was not so overwhelming as to render all these errors harmless. Lastly, the court was influenced in its decision to review the issues by its inability to determine from the record whether the defendant had been informed that defense counsel's prior service on a commission might create a conflict of interest.

We believe that *People v. Sales* is distinguishable. As noted above, the evidence of defendant's guilt is overwhelming. Furthermore, the State's Attorney did not refer to Kristina Hickey's virginity, either implicitly or explicitly. He merely contrasted Kristina Hickey's character and social relationships with those of Lisa Wrobel, defendant's alibi witness. He then suggested to the jury that Kristina Hickey refused to have sex with defendant and that, as a result, defendant killed her.

## INVOLUNTARY MANSLAUGHTER INSTRUCTION

Next, defendant contends that the trial court erred when it refused to instruct the jury on the offense of involuntary manslaughter. We disagree.

In *People v. Foster* (1987), 119 Ill. 2d 69, 87, 518 N.E.2d 82, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044, the Illinois Supreme Court explained the difference between involuntary manslaughter and murder:

> "The basic difference between involuntary manslaughter and murder is the mental state which accompanies the conduct causing the homicide. To sustain a conviction for murder, there must be sufficient evidence by which it is shown that the accused either intended to kill or knew of the strong probability of death or great bodily harm. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) Involuntary manslaughter is defined as the killing of a human being by actions 'which are likely to cause death or great bodily harm *** and [are] perform[ed] recklessly.' (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) *** A person acts recklessly when he 'consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.' Ill. Rev. Stat. 1985, ch. 38, par. 4—6." (*People v. Foster*, 119 Ill. 2d at 87-88.)

The court also explained when it is necessary to instruct a jury on the offense of involuntary manslaughter:

"When there is evidence in the record which, if believed by the jury, would reduce the crime of murder to manslaughter, an instruction defining the lesser crime should be given. (*People v. Ward* (1984), 101 Ill. 2d 443, 451; *People v. Cannon* (1971), 49 Ill. 2d 162, 165.) An involuntary manslaughter instruction should not be given where the evidence clearly shows that the homicide was murder. *People v. Simpson* (1978), 74 Ill. 2d 497, 501; *People v. Sanders* (1974), 56 Ill. 2d 241, 253." *People v. Foster*, 119 Ill. 2d at 87.

In the present case, the evidence clearly shows that Kristina Hickey was murdered. Alan Kulovitz, the evidence technician, testified that the left side of Kristina's dress did not have blood on it, an indication that the dress had been folded before Kristina was stabbed in the chest. Mr. Kulovitz also testified that, when he examined Kristina's body, he observed that her arms were behind her back and that her right arm was held in that position with the belt from her coat. Mr. Kulovitz was able to determine from the pattern of blood from the chest wound and from the mound of dirt covering Kristina's right foot that Kristina's body was in the same position as when death occurred. Dr. Eupil Choi testified that he observed abrasions on the right side of Kristina's face which were probably caused by her face being struck against an object. There were multiple abrasions and skin bruisings on the left side of Kristina's neck and collar bone and over the left jaw which were consistent with someone kneeling on her shoulder and neck or with her face being struck with some object. Dr. Choi also found blood between Kristina's scalp and her skull, consistent with her head being struck against a hard surface. Lastly, Dr. Choi observed a single, deep slash wound, six inches in length, over the front of Kristina's neck and extending from side to side. There was a complete transection of Kristina's throat, trachea and esophagus. We believe that the manner in which Kristina was killed, the numerous bruises on her body and the evidence that her right arm had been tied behind her body defeat defendant's claim that his actions were reckless. Therefore, we conclude that the trial court did not err in refusing to instruct the jury on involuntary manslaughter. See *People v. Foster*, 119 Ill. 2d at 88 (holding that the trial court did not err in refusing to instruct the jury on involuntary manslaughter where the "record emphatically reject[ed] the defendant's assertion that his actions were reckless and not intentional"); *People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696 (holding that the severity of the beating negated any sug-

gestion that defendant's conduct was only reckless); *People v. Mitchell* (1987), 163 Ill. App. 3d 58, 66-68, 516 N.E.2d 500 (holding that evidence adduced at trial that the cut on the victim's neck extended virtually from ear to ear, severing the jugular vein and lacerating the larynx was consistent with murder and not involuntary manslaughter); *People v. Fenderson* (1987), 157 Ill. App. 3d 537, 548, 510 N.E.2d 479 (holding that the severity of the victim's injuries negated any suggestion that defendant's conduct was only reckless).

    ■ Defendant claims that the statements he gave to Assistant State's Attorney Paul Perry and Detective Kuester show that his actions were reckless. We disagree. Defendant told Detective Kuester that he accidentally cut Kristina's neck. Defendant told Assistant State's Attorney Perry that he "didn't realize the knife was in [his] hand at the time" and he "might have, without realizing, stabbed [Kristina] once or twice" in the chest. Defendant also told Perry that Kristina turned her head suddenly and [defendant] might have cut her neck "on accident." A defense theory that death was by accident belies the element of reckless disregard for one's actions which is necessary to sustain an involuntary manslaughter conviction. (*People v. Moore* (1980), 89 Ill. App. 3d 202, 208-09, 411 N.E.2d 579.) Thus, an instruction of involuntary manslaughter should be refused where the theory is that death was by accident or misadventure. (*People v. Lowe* (1970), 122 Ill. App. 2d 197, 209, 258 N.E.2d 370.) Defendant's statements that he killed Kristina Hickey by accident could not justify the giving of an instruction of involuntary manslaughter.

## EXCESSIVE SENTENCE

    Next, defendant argues that the trial court erred in sentencing him to natural life imprisonment. We find that this argument is without merit.

    ■ Initially, we note that the imposition of a sentence is a matter involving considerable judicial discretion (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344; *People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 373, 497 N.E.2d 1183), and, where the sentence imposed is within the statutory limits, a reviewing court will not exercise its power to reduce the sentence absent a finding that the trial court abused its discretion. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 494, 508 N.E.2d 708, *cert. denied* (1987), 484 U.S. 929, 98 L. Ed. 2d 257, 108 S. Ct. 297; *People v. Smith* (1988), 172 Ill. App. 3d 94, 112, 526 N.E.2d 849.) It is generally recognized that the trial court is in a superior position during the trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be im-

posed than are courts of review. *People v. Cabrera,* 116 Ill. 2d at 494.

Section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)) provides in relevant part:

"[I]f the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment ***."

An aggravating factor listed in section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) is that the victim was killed during the course of another felony, such as armed robbery or rape.

In the present case, defendant sexually assaulted, robbed and killed Kristina Hickey. Thus, the trial court was authorized by statute to impose a sentence of life imprisonment. Furthermore, the trial court found that "the murder of Kristina Hickey was accompanied by brutal behavior indicative of wanton cruelty," another basis for imposition of a life sentence.

■■■ Defendant disputes the trial court's finding that his conduct was indicative of wanton cruelty. He asserts that his conduct was neither brutal nor heinous since he "accidentally" inflicted the chest wounds and slashed Kristina Hickey's neck. He also notes that the medical evidence indicated that Kristina died very quickly. Conduct is "heinous" if it is hatefully or shockingly evil, grossly bad, enormously and flagrantly criminal. (*People v. La Pointe,* 88 Ill. 2d at 501; *People v. Nester* (1984), 123 Ill. App. 3d 501, 504, 462 N.E.2d 1011.) "Brutal" includes conduct which is grossly ruthless, devoid of mercy or compassion, or cruel and cold-blooded. (*People v. La Pointe,* 88 Ill. 2d at 501.) A showing that torture or unnecessary pain was inflicted upon the victim is not a prerequisite to finding that the defendant's behavior was brutal or heinous. *People v. La Pointe,* 88 Ill. 2d at 501; *People v. Hickman* (1986), 143 Ill. App. 3d 195, 205, 492 N.E.2d 1041.

As noted above, the evidence at trial shows that defendant's actions in killing Kristina were deliberate and not merely "accidental." The testimony also shows that defendant tied Kristina's right hand behind her back and inflicted numerous bruises and abrasions on her body. The abrasions on the right side of Kristina's face were probably caused by her face being struck against an object. The bruises on the left side of her neck and collar bone were consistent with someone kneeling on her shoulder and neck or with someone striking her with some object. A three-inch bruise on her left jaw was consistent with her head being slammed against a hard surface. Lastly, the blood be-

tween her scalp and skull indicated that her head had been struck against a hard surface. The testimony also shows that defendant stabbed Kristina twice in the chest and then slashed her throat, trachea and esophagus. Defendant's conduct was shockingly evil, cruel and devoid of mercy.

■■■ We are aware of the fact that defendant was 17 years old at the time of the murder. However, as we observed in *People v. Darnell* (1981), 94 Ill. App. 3d 830, 838, 419 N.E.2d 384, quoting *People v. West* (1977), 54 Ill. App. 3d 903, 909, 370 N.E.2d 265, 270, "[d]efendant's youthfulness is not alone sufficient to justify a reduction of sentence. 'The nature of the crime, the protection of the public, deterrence and punishment have equal status in the consideration.' " (See also *People v. La Pointe*, 88 Ill. 2d 482 (18-year-old defendant was sentenced to natural life imprisonment without parole); *People v. Walker* (1985), 136 Ill. App. 3d 177, 483 N.E.2d 301 (17-year-old defendant was sentenced to life imprisonment).) In the present case, we believe that the trial court did not abuse its discretion in sentencing defendant to life imprisonment.

SENTENCING PROVISIONS

Lastly, defendant contends that section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)) violates the Federal (U.S. Const., amend. XIV) and State (Ill. Const. 1970, art. I, §2) constitutional guarantees of due process and equal protection. Defendant notes that under that section of the Unified Code of Corrections, the court may sentence a defendant who is convicted of murder to a term of natural life imprisonment if it finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Defendant also notes that, pursuant to section 5—8—2(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)(1)), a court may sentence a defendant to an extended term of imprisonment for murder if it finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Defendant asserts that the Unified Code of Corrections contains two distinct sentencing provisions for one class of offenders without setting forth criteria for the trial court to decide which of these sentencing provisions it should employ. Defendant also asserts that no rational basis exists for differentiating between the offenders who may be sentenced to natural life imprisonment and those who may be sentenced to an extended term of imprisonment.

Defendant has waived this issue by failing to raise it below. (*People v. Burke*, 164 Ill. App. 3d at 899; *People v. Nester*, 123 Ill. App. 3d at

507; *People v. Perez* (1983), 113 Ill. App. 3d 143, 151, 446 N.E.2d 1229; *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 591, 444 N.E.2d 662.) Moreover, in *People v. Cartalino* (111 Ill. App. 3d at 591-92), we considered and rejected an attack upon the constitutionality of the sentencing provisions:

> "Cartalino's argument ignores the aggravating and mitigating factors—as distinct from a finding of brutal conduct—which the Code mandates a circuit court to weigh before imposing any sentence, including one for natural life or an extended term. It is the presence or absence of the specified statutory factors which determine the nature of the sentence imposed on a defendant found guilty of a brutal and heinous murder. It cannot be concluded, from the foregoing, that a circuit court has the totally unbridled discretion to sentence a defendant to natural life or to an extended term. We conclude, therefore, that Cartalino has failed to overcome the strong presumption of the statute's constitutionality (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499, 431 N.E.2d 344), even had there been no waiver."

■■ Defendant submits that *People v. Cartalino* was decided incorrectly. He maintains that *People v. Cartalino* did not resolve the constitutional infirmities of the sentencing provisions since the factors in mitigation and aggravation are to be considered in imposing either a sentence of natural life imprisonment or an extended term sentence. We considered and rejected this argument in *People v. Burke* (164 Ill. App. 3d at 899-900). We believe that the factors in mitigation and aggravation provide the necessary guidance for the trial court to decide whether a particular defendant should be sentenced to life imprisonment or to an extended term.

We have reviewed the numerous arguments made by defendant and we have found them to be without merit. Accordingly, we affirm defendant's conviction and sentence.

Affirmed.

McNAMARA* and RIZZI, JJ., concur.

---

*Justice McNamara participated in this appeal prior to his assignment to the sixth division.