NOTICE
Decision filed 05/16/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200096-U

NOS. 5-20-0096, 5-20-0097 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | Nos. 92-CF-4, 92-CF-5 |
| | ) | |
| MARK GIBBS, | ) | Honorable |
| | ) | Jeffery B. Farris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's sentence of natural life in prison was authorized by statute where he pled guilty to killing more than one victim. The defendant's natural life sentence, imposed after a resentencing hearing at which the court heard and considered extensive evidence concerning the *Miller* factors, did not violate the federal and state constitutions under *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Holman*, 2017 IL 120655. The court did not rely on misstatements of facts in determining the defendant's sentence. Mention of an improper sentencing factor did not require reversal where it played no role in the court's sentence. The trial judge did not substitute his personal beliefs for the analysis offered by the defendant's expert witness. The defendant was not denied his right to the effective assistance of counsel, either due to the defense team's failure to fully comply with Rule 711 or because defense counsel allowed one of the law students assisting under that rule to stand on the written motion to reconsider sentence.

¶ 2    In January 1992, the defendant, then 17 years old, shot both of his parents to death. He initially claimed that he found them after returning from the grocery store, but he later confessed to the crime. In February 1995, the defendant pled guilty. The court sentenced him to natural life

1

in prison, a sentence that was mandated by statute because the defendant killed more than one individual. See 1989 Ill. Rev. Stat., ch. 38, ¶ 1005-8-1(a)(1)(c) (now at 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2020)).

¶ 3    In 2012, the United States Supreme Court held that a mandatory sentence of life in prison without parole violates the eighth amendment (U.S. Const., amend. VIII) when imposed for a crime committed by a juvenile. See *Miller v. Alabama*, 567 U.S. 460, 479 (2012). Subsequently, the defendant filed a postconviction petition, arguing that his sentence was unconstitutional under *Miller*. During postconviction and resentencing proceedings, defense counsel was assisted by four law students pursuant to Illinois Supreme Court Rule 711 (eff. July 1, 2017), one of whom presented arguments prior to being certified under that rule. After conducting a lengthy resentencing hearing during which the court heard and considered substantial evidence concerning the *Miller* factors, the court sentenced the defendant to a discretionary sentence of natural life in prison. The defendant filed a motion to reconsider sentence, which the court denied.

¶ 4    On appeal, the defendant argues that (1) his natural life sentence was not authorized by the applicable 1992 statutes; (2) the sentence is unconstitutional under *Miller* because the court did not give adequate consideration to the mitigating features of youth; (3) the court misstated evidence before it and relied on these misstatements of fact in imposing the sentence; (4) the court considered a factor inherent in the offense of murder as a factor in aggravation; (5) the trial judge substituted his personal views for the analysis provided by the defendant's expert witness; (6) the defendant was denied the assistance of counsel due to violations of Rule 711; and (7) he received ineffective assistance of counsel because one of the students stood on the written motion to reconsider sentence, thereby forfeiting issues he raises on appeal, and the supervising attorney did not correct this error. We affirm.

2

¶ 5                          I. BACKGROUND

¶ 6     On the evening of January 6, 1992, the defendant fatally shot his parents, Richie and Betty Gibbs, while they slept. Richie died immediately. Betty died in the hospital a few days later. After the shooting, the defendant called his uncle, Gary Gibbs, who called the police and ambulance. Initially, the defendant told his uncle and the responding police officers that he returned from the grocery store to find that his parents had been shot. However, he later confessed to the murders.

¶ 7     The defendant filed a motion to suppress his statements. At a hearing on that motion, Agent John Nagle testified about the circumstances surrounding the defendant's statements. Nagle testified that the defendant initially told Agent Monica Joost and Deputy David Livesay, two of the responding officers, that he found his parents after returning from the grocery store. Nagle decided to reinterview the defendant after learning that a telephone call had been placed from the Gibbs residence to Reverend Scott Smith, something the defendant did not mention in his initial statement to Joost and Livesay. Nagle questioned the defendant in a police vehicle parked outside the Gibbs residence.

¶ 8     Nagle testified that the defendant told him that he returned home from the store to find that his parents had been shot. When the defendant finished his story, Nagle asked the defendant if he remembered anything else that he had forgotten to mention. The defendant said he could not remember anything else. When Nagle told the defendant that he knew about the call to Smith, the defendant acknowledged making the call. In response to questioning, the defendant admitted to Nagle that he had called Smith before calling his uncle. He further admitted that before calling Smith, he had called one of Smith's relatives to obtain Smith's phone number. Nagle told the defendant that he thought it was "quite unusual" that he would place two phone calls before calling his uncle. At this point, the defendant admitted that he shot his parents.

3

¶ 9     Nagle was asked to describe the defendant's emotional state during his interview in the police car. He replied, "I would say he was nervous. He wasn't crying or physically upset."

¶ 10    The defendant was arrested and taken into custody. Shortly after midnight, he gave a more detailed statement to Nagle and Trooper James Patterson. He told them that he decided to kill both his parents because he feared he would get in trouble due to his bad grades in school. He stated, "I thought killing my parents would solve my problem." He acknowledged that he did not have any problems with his parents on the day of the shooting.

¶ 11    The defendant gave the following account of the events surrounding the shooting: He returned home from school at 4:15 p.m. and began doing his laundry. His parents were not home at the time. They arrived home half an hour later, at which time his mother prepared dinner while his father watched television. The defendant ate dinner alone in the kitchen while his parents ate their dinner in the front room.

¶ 12    After dinner, the defendant went upstairs, finished his laundry, and retrieved his father's gun from the top drawer of his parents' dresser. He then left the gun in his bedroom and went downstairs to retrieve 10 shells from a pair of coveralls that were located downstairs. While he was downstairs, the defendant noticed that his mother had fallen asleep on the sofa. He returned to his bedroom and loaded the gun.

¶ 13    After loading the gun, the defendant came downstairs and saw that both of his parents were asleep. His mother was sleeping on the sofa, and his father was sleeping on the floor, lying on his back. The defendant shot his father once in the head, then shot his mother twice in the head. He then went upstairs and packed a suitcase so he could run away.

¶ 14    The defendant put the suitcase in the back of his mother's car, then went back into the house to get the gun. After putting the gun in the front seat of his mother's car, he went into the

4

house again to call Scott Smith, a preacher he knew who lived in Georgia. His intent was to run away to Smith's house, and he needed to get directions.

¶ 15 However, the defendant "decided not to go to Scott's, but to find a way to hide what [he] did to [his] parents." To that end, he decided to drive into town and go to the store and make it look like his parents were shot while he was out. He took a 12-pack of Pepsi from the house and put it in the car to dispose of elsewhere so it would look like he needed to go to the store for more Pepsi. He also took $16 from his father's wallet. Taking the money required the defendant to roll his father's body to the side so he could reach into his father's back pocket to retrieve the wallet.

¶ 16 The defendant drove to an iron bridge near his house, dropped the gun into a creek, and then drove into town. He went to a grocery store and bought milk and soda. He then threw the 12-pack of Pepsi he had taken from the house into a dumpster and drove back to the house.

¶ 17 When he got home, the defendant took his suitcase out of the car, brought it upstairs, and unpacked. He then called his uncle, Gary Gibbs, to tell him that his parents had been shot. Gary told the defendant he would come to the house. At this point in his story, the defendant stated that he could hear his mother breathing. Although he told Nagle and Patterson that he had thought she was dead before he left to go to the store, he did not clarify precisely when he noticed she was still breathing. The defendant admitted that he did not call the police or an ambulance. Instead, he went outside and waited for Gary to arrive.

¶ 18 The defendant acknowledged that he initially told both his uncle and the police that he found his parents upon arriving home from the store, as he had planned to do. He explained his decision to tell the truth as follows: "I figured I would end up with more trouble if I continued to lie."

5

¶ 19 The trial court granted the motion to suppress. On appeal, however, this court reversed that ruling in part, holding that while the defendant's statements at the scene—given without the benefit of *Miranda* warnings—were properly suppressed, his subsequent detailed statement—given after he was provided with *Miranda* warnings—was voluntary and, therefore, admissible.

¶ 20 On February 27, 1995, the defendant entered an open plea of guilty. The prosecutor presented the factual basis for the offense. In pertinent part, he told the court that if the matter went to trial, the State would present testimony that the defendant told two female students about his plan to shoot his parents earlier on the day they were shot.

¶ 21 The court sentenced the defendant to natural life in prison. This sentence was required by statute because the defendant killed more than one person. See 1989 Ill. Rev. Stat., ch. 38, ¶ 1005-8-1(a)(1)(c). As such, the court did not consider factors in aggravation and mitigation.

¶ 22 In 2012, the United States Supreme Court held in *Miller* that mandatory sentences of life in prison without the possibility of parole run afoul of the eighth amendment when imposed for crimes committed by juveniles. *Miller*, 567 U.S. at 479. In 2015, the defendant filed a postconviction petition challenging his sentence on the basis of *Miller*. The petition was filed through counsel. The attorney representing the defendant later withdrew as counsel, and the defendant subsequently retained attorney Damian Ortiz to represent him in the postconviction proceedings.

¶ 23 On June 25, 2018, Ortiz filed an amended postconviction petition on the defendant's behalf. He alleged that the defendant faced "significant developmental and physical growth challenges" while growing up; that he was abused by his father throughout his childhood, both physically and mentally; that he has shown remorse for his actions; and that he has "maintained a

6

positive prison disciplinary record." He argued that the defendant's natural life sentence was unconstitutional under *Miller*, and that, as such, he must be resentenced.

¶ 24     We note that although the court did not initially enter an order explicitly granting the postconviction petition, the court and both parties operated under the assumption that a new sentencing hearing was required under *Miller*. To that end, the parties presented the court with arguments concerning what possible sentences the court could impose. The court held a hearing to address that question on January 15, 2019.

¶ 25     At the outset of the January 2019 hearing, the court noted for the record that the defendant was present in court with his lead attorney, Damian Ortiz, and two of the law students who assisted Ortiz pursuant to Rule 711. The two students introduced themselves as Marlee Turim and Margaret Shadid, both from the Pro Bono Clinic at John Marshall School of Law. The court inquired, "And you're both 711 licensed?" Shadid replied, "License pending, Your Honor." The court addressed the defendant, stating, "Mr. Gibbs, it's my understanding that some or all of the arguments that are going to be made today on your behalf are going to be made by these two ladies. Now, they're both law students; they're not lawyers. You understand that?" The defendant indicated that he understood. The court asked the defendant if he was comfortable with the students presenting arguments. He replied, "Yes, sir." We note that, although the defendant consented orally to representation by the students, the record does not contain a written consent. The court stated that he would allow attorney Ortiz to supplement the arguments of the students "given the nature of the case."

¶ 26     The court then turned its attention to the parties' arguments concerning the sentencing range available and whether the sentences were to be served concurrently or consecutively. The defendant opted to be sentenced under the laws in effect in 1992, when the offenses were

7

committed.[1] The parties and the court agreed that the ordinary sentencing range for first degree murder was 20 to 60 years. They also agreed that sentences on the two murders were to be served concurrently.

¶ 27    The court heard arguments concerning the applicability of statutory provisions authorizing extended-term sentences of 60 to 100 years or natural life in prison. The court noted that the statute in effect in 1992 provided that "[t]he court shall sentence the defendant to a term of natural life if it involves more than one victim." Turim argued on the defendant's behalf that under *Miller*, this provision was made inapplicable to offenses committed by juveniles. She acknowledged, however, that a natural life sentence would be consistent with *Miller* if it is discretionary rather than mandatory. Shadid argued that an extended-term sentence of 60 to 100 years would run afoul of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because there were no findings by a jury concerning any of the factors that would make the defendant eligible for this sentence. The court took these matters under advisement, and eventually ruled that the defendant could be sentenced to either a term of 20 to 60 years or to natural life in prison.

¶ 28    The resentencing hearing took place over two days in November 2019. In aggravation, the State presented the testimony of the defendant's uncle, Gary Gibbs, and the defendant's cousin, Bradley Pender. Gary Gibbs testified that when he arrived at the defendant's house on the night of the shootings, he saw his sister-in-law, Betty Gibbs, "blowing bubbles in her own blood." He also

---

[1]We note there is a significant difference between the way sentence credit for good conduct was calculated under the statutes in effect in 1992 and the way it is calculated under the statutes in effect now and when the defendant was resentenced in 2019. In 1992, a defendant received day-for-day good conduct credit against his sentence unless he was serving a natural life sentence. 1989 Ill. Rev. Stat., ch. 38, ¶ 1003-6-3(a)(2). Under the "truth-in-sentencing" provisions, enacted subsequent to the defendant's plea, a prisoner serving a term of years for murder is not eligible for good conduct credit. 730 ILCS 5/3-6-3(a)(2)(i) (West 2016). In his postconviction petition, the defendant argued that applying sentencing provisions enacted subsequent to the offense, such as the "truth-in-sentencing" law, would constitute an impermissible *ex post facto* punishment.

testified that someone representing the defendant contacted him, but he told her that she would not want to hear what he had to say. He testified that the defendant never confided to him that he had been abused.

¶ 29     Bradley Pender's mother is the sister of Gary and Richie Gibbs. Pender testified that he was five years older than the defendant and that he saw him twice a week on average while they were growing up. He explained that the extended family spent most holidays and many weekends at the home of his grandparents. Pender testified that he never saw Richie get drunk or abuse the defendant. He further testified that he never saw any evidence of a black eye or any other injury to the defendant and that the defendant never told him about any abuse. Pender acknowledged that the defendant did not confide in him about other matters either.

¶ 30     Pender testified that on the night of the murders, he called his uncle, Gary Gibbs, on the telephone. Gary's daughter answered the phone and told him that Gary had gone to Richie and Betty's house in response to a phone call he had received from the defendant. Pender drove to Richie and Betty's house, approximately a five-minute drive from his family's home. He arrived after Gary, but before the police. Pender testified that the first thing he saw on arrival was the defendant "sitting on a retaining wall near the home, slumped over, kind of crying." The defendant did not say anything to Pender. Pender entered the house and saw his aunt, Betty Gibbs, "on the couch trying to breathe."

¶ 31     The State also presented victim impact statements from seven members of Richie Gibbs's family. Wendy Charles, Gary Gibbs's daughter, stated that she answered the phone when the defendant called to tell Gary about the murders. She stated that the defendant had "quite a giggle" in his voice when he spoke to her, but she also stated that the defendant was crying when he talked to Gary. Richie's aunt, Linda Gibbs Samuels, described her visits with the defendant while he was

in jail awaiting trial. She stated that when she visited him a few days after the shooting, his first words to her were, "Surprise, surprise." She stated that he showed no remorse when she visited him a second time. Both Wendy Charles and her mother, Judy Gibbs, stated that Gary Gibbs experienced health problems after the shootings.

¶ 32    In mitigation, the defendant presented a mitigation report prepared by social worker Melissa Mahabir and professor of social work Dr. Kalyn Flynn. Mahabir testified at length at the resentencing hearing about the contents of the report. Because the defendant challenges many of the court's rulings concerning her testimony and the contents of the report, we will set forth her testimony in detail.

¶ 33    Mahabir testified that she is a social worker and mitigation specialist. She explained that mitigation work involves providing a life history of an individual—typically a criminal defendant—to a court. She described the process she and Dr. Flynn used in preparing the mitigation report in this case. Mahabir testified that they conducted 14 in-person interviews with the defendant and attempted to corroborate what he told them through "collateral interviews" with family members, friends, and correctional officers who knew him and through documentary records, such as school records, police records, and prison records.

¶ 34    Mahabir next testified that she and Dr. Flynn researched the issue of parricide, meaning cases in which a child murders his or her parents. She explained that research by Dr. Kathleen Heide, a leading expert in the field, shows that parricide usually occurs in circumstances where the child is "dangerously antisocial," has severe mental illness, or has been severely abused. Marlee Turim, one of the law students assisting counsel, asked Mahabir about the relationship between these findings and the defendant's life history. At this point, the State objected, arguing that Mahabir was not qualified as an expert to give an opinion on whether the defendant fit in any of

10

the three categories. The prosecutor noted that at that point, she had not even been proffered as an expert witness. In response, the court stated, "I assume she's going to be proffered, I believe, as a mitigation expert." The court noted that if qualified as an expert witness, Mahabir could rely on texts, such as those of Dr. Heide.

¶ 35   Turim asked Mahabir further questions about her expertise and experience. In pertinent part, Mahabir testified that her job title is that of forensic social worker. Turim tendered her as an expert in the fields of mitigation and forensic social work. The State again objected, arguing that the defense cannot qualify Mahabir as an expert in one field and then use her testimony to "shoehorn in" Dr. Heide's opinions in another field. The prosecutor noted that Dr. Heide states in her book that determining whether an adolescent parricide defendant fits into any of the three categories she identified depends on a careful evaluation by a mental health professional.

¶ 36   The court questioned Mahabir about the job title of "forensic social worker" with no objection from either party. The court asked whether that is a recognized job title that a social worker can have anywhere "or is it a—for example, you can work for Hyatt Regency and be called an 'events specialist manager' but you're a party planner." Mahabir testified that the job title of "forensic social worker" is recognized by the National Association of Social Workers and is not unique to her workplace. In response to further questions, she explained that forensic social work is simply work performed within the criminal justice system, including preparing presentence investigation reports (PSIs) and recommending services for prisoners. The court asked Mahabir how she became qualified as a forensic social worker. In particular, the court asked whether she went "to some specialized training where [she got] a certificate to hang on the wall or put in [her] scrapbook." Mahabir testified that the position does not require any specialized training beyond the training necessary to become licensed as a social worker. The court qualified Mahabir as an

11

expert in social work. Pursuant to the request of attorney Ortiz, the court later clarified that Mahabir was qualified as an expert in social work for the purpose of mitigation.

¶ 37    Mahabir was next asked to testify about her findings. She testified that she learned that Richie Gibbs had abused alcohol, which led to both physical and verbal abuse of the defendant and Betty. This abuse, in turn, led to low self-esteem and poor achievement in school for the defendant. Mahabir obtained this information from the defendant, two of his aunts, and his maternal grandmother. She stated that the claim of alcohol abuse was also corroborated from police records documenting that Richie Gibbs was arrested on two charges of driving under the influence and one charge of unlawful delivery of marijuana.

¶ 38    Mahabir next testified about the effects of trauma in the defendant's life. She testified that Richie regularly hit the defendant and that the defendant regularly witnessed arguments between his parents and physical abuse of his mother by his father. She testified, "I'm not diagnosing Mark. I don't have that, you know, credential. But he has traits that correspond to trauma—withdrawal and feelings of shame, low self-esteem, anxiety, sadness." Turim asked, "How do you believe that this trauma led to the murder of his parents?" The State objected, arguing that Mahabir was not qualified to make that assessment. The court overruled the objection, but stated that he would "consider her qualifications in how much weight I give the answer." Mahabir testified that people who experience trauma feel like their lives are in jeopardy. She explained that due to the severity of the trauma experienced by the defendant and the fact that it continued throughout his entire childhood, she believed that he just wanted the violence to stop and did not know how to make that happen.

¶ 39     Mahabir further testified that the defendant had expressed "deep remorse" to her, which she believed was authentic. She also testified that the corrections officers she interviewed believed that the defendant was unlikely to reoffend.

¶ 40     On cross-examination, Mahabir was asked about the disciplinary infractions in the defendant's prison records, which were referenced in the mitigation report. She testified that there were four infractions in 1996, three in 1997, and four in 1998. She acknowledged that she did not describe in her report any of the underlying conduct that led to these infractions. She further acknowledged that this would have been useful information because the seriousness of an infraction was a relevant consideration. She testified that the defendant had no infractions after 2002.

¶ 41     Mahabir testified that the defendant reported to her that he had a loving relationship with his mother, although she also noted that he never discussed the abuse with his mother. When asked how the killing of his mother related to his mental state of wanting the violence to end, Mahabir explained that the defendant himself was unsure of why he killed his mother. She noted that the defendant described the incident to her "as happening in like five seconds." She further stated, "I don't know if we've—if we would have had more time with Mark to unpack that."

¶ 42     Mahabir acknowledged that in reviewing Richie Gibbs's police reports, she did not find any arrests for domestic violence. She further acknowledged that there were no investigations of abuse in the Gibbs family by the Department of Children and Family Services. Finally, she acknowledged that none of the defendant's school records indicated that any teachers or other school personnel observed any signs of physical abuse on the defendant. Asked if the defendant indicated that he ever discussed the abuse with anyone, Mahabir testified that he told her he

confided about the abuse to his uncle, Gary Gibbs. As mentioned earlier, Gary denied that this occurred.

¶ 43    The defendant also presented three letters of support from members of his mother's family. Betty's sister, Donna Gibbs,[2] stated that Richie pushed Betty down a flight of stairs while she was pregnant. She also alleged that there was ongoing violence in the marriage, but did not offer specific examples. Another sister, Etha Anderson, stated that she saw the defendant with a black eye on at least one occasion and that other family members had told her that they had seen both Betty and the defendant with black eyes multiple times. Betty's mother, Mary McWhorter, made similar allegations concerning violence by Richie. She further stated that Betty left Richie once, but that they later reconciled.

¶ 44    Prior to considering the parties' arguments concerning the sentence, the court heard arguments on the State's motion to strike portions of the mitigation report. It is worth noting that the court denied most of the State's requests. The court, however, did strike some portions of the report. For example, the court agreed to strike a portion of the background information stating that Betty underwent a hysterectomy because she caught a sexually transmitted disease from Richie. The court found that the allegation had no relevance. The court also struck the reference in the report to one of Richie's three arrest records because the State presented evidence that it had been an invalid arrest. The court denied the State's request to strike several photographs in the report based on a lack of foundation, but noted that he did not find the photographs particularly relevant. The court agreed to strike portions of a paragraph explaining the "danger assessment" tool, which uses various criteria to measure the level of a danger an abusive partner poses. Included in the stricken material was a sentence stating that Betty met five of those criteria. Notably, however, the

---

[2]We note that Donna Gibbs's ex-husband was one of Richie Gibbs's cousins.

court did not strike the remainder of the paragraph, in which Mahabir and Flynn wrote that Betty suffered severe abuse and that witnessing it "must have been deeply traumatizing" to the defendant.

¶ 45    Most significantly, the court struck paragraphs in the mitigation report that discussed the relationship between "complex trauma" and brain development. The basis for the court's ruling was the lack of evidence that Mahabir had any expertise in neurology. The stricken paragraphs explained that those who experience complex trauma experience feelings of insecurity, have difficulty forming attachment, and are at increased risk for antisocial behavior. We note that the court refused to strike everything the State wanted stricken from this portion of the report. In particular, the court did not strike language describing the defendant's mental state and opining that at the time of the murders, he "saw no way out."

¶ 46    The parties presented arguments concerning the appropriate sentence, and the defendant gave a statement in allocution. Before ruling, the court addressed "the lay people" in the courtroom, explaining aspects of the proceedings. At one point, he referred to the "victims on this side." Although not stated directly, this was an apparent reference to the two sides of the defendant's family. The court went on to say:

> "another reflection that I have made just from what I reviewed in these cases and heard testimony in this case is that there was a day when this courtroom would not have been divided in two. It is sad that it is, and I don't know how to change it. I wish that I could, but it sounds as though at one time there was, what I would refer to as just a great big, wonderful country family. I may have personally experienced that myself. I do know how tragedies and loss of loved ones can affect that, also."

¶ 47    The court next provided a detailed ruling from the bench. The court began by stating,

15

"I want the record to reflect that I have considered all the relevant evidence at the sentencing hearing, including, but not limited to, the mitigation report, the testimony of the qualified expert, *** any other evidence solicited, and, not the least of which, which is allowed even in the new statute, any other information that I found relevant and reliable."

The court went on to note that he considered the PSI, the defendant's statement in allocution, and the statements of his family members.

¶ 48     The court first considered the statutory factors in aggravation and mitigation applicable to both juvenile and adult defendants. In aggravation, the court found that the defendant's conduct caused serious harm in both cases (1989 Ill. Rev. Stat., ch. 38, ¶ 1005-5-3.2(a)(1)) and that there was a need to deter others (*id.* ¶ 1005-5-3.2(a)(7)). The court did not elaborate further on either of these factors. The court considered the State's argument that the defendant received compensation for the offense because he removed money from his father's pocket (*id*. ¶ 1005-5-3.2(a)(2)). The court stated, "I don't know that I'm necessarily considering this as compensation for committing the offense," but noted "that could be a factor in aggravation."

¶ 49     In addressing factors in mitigation, the court noted that the defendant had no criminal or juvenile history (*id.* ¶ 1005-5-3.1(a)(7)). The court then turned his attention to two mitigating factors that were emphasized by the defense in its arguments—that the defendant's conduct was induced by someone other than the defendant (*id.* ¶ 1005-5-3.1(a)(5)) and that the defendant's conduct was the result of strong provocation (*id.* ¶ 1005-5-3.1(a)(3)). The court found the first factor to be inapplicable. The court then considered whether the allegations of abuse were sufficient to constitute strong provocation. The court observed that there are many cases where a parent stays with an abuser, but stated that he could not understand why a parent would not remove herself and her children from that situation. The court then stated that the evidence showed that

16

"there [was] a belief" that both Betty and the defendant had been abused by Richie. The court went on to state, "Unlike some of the others that I have seen in my career, that there was a time when Betty had the strength to get up and leave, when Betty removed herself *** and her child from the situation." The judge stated that he did not understand why she went back to Richie "unless something drastic changed."

¶ 50    The court then considered the additional factors mandated under Illinois's new youth sentencing statute, section 5-4.5-105 of the Unified Code of Corrections. See 730 ILCS 5/5-4.5-105 (West 2016). We note that, although the defendant opted to be sentenced under the law in effect at the time of the offenses, the court considered these factors because they largely coincide with the factors set forth in *Miller*.

¶ 51    In addressing these factors, the court noted that the defendant was 17 years old at the time of the offenses, a chronological age near the upper end of the juvenile age range. See *id.* § 5-4.5-105(a)(1). The court noted that the next factor to consider was the defendant's impetuosity. See *id.* The court stated, "I'm not 100 percent sure what they mean by 'impetuosity'." However, the court went to find that, based on the statements of family members and his observations of the defendant in the courtroom, "I don't know that among his cousins and among his family that he was the most impetuous." The court went on to consider the defendant's maturity and competence. See *id*. The court noted that the defendant was less mature than the average 17-year-old and that he had "some difficulty with cognition" even though he was not diagnosed with any psychiatric disorder or cognitive impairment.

¶ 52    The court next considered the defendant's home life. See *id.* § 5-4.5-105(a)(3). The court suggested that the defendant's poor academic achievement and smaller physical size may have led to a difficult home life because parents want their children "to be the biggest and the strongest and

17

the best sportsman and the best and the smartest in their class." In addressing the allegations of abuse, the court stated that it may be impossible to "know exactly what the relationship was between Richie and Betty and the defendant, Mark." The court stated, however, that it was difficult to believe that none of the defendant's aunts, uncles, cousins, or grandparents noticed any bruises. The court further stated:

"Let's say I believe that he was abused to the degree that he might be in some way justified in committing some offense against his father and that I might be inclined to consider that to the degree that I believe that I should change his sentence today. I'm saying right now, I can't get past the mother. I can't get past, after having shot the father, that he went and planted two bullets in Momma."

¶ 53    The court found that the impact of peer pressure or familial pressure was inapplicable to the circumstances of this case. See *id.* § 5-4.5-105(a)(2). The court noted that the defendant had shown some evidence of rehabilitation during the 25 years he had been incarcerated, pointing to the evidence that he had earned his general equivalency diploma (GED) and a culinary certificate. See *id.* § 5-4.5-105(a)(4). In considering the defendant's role in the offense and his degree of participation, the court emphasized that the defendant was the sole participant. See *id.* § 5-4.5-105(a)(6). The court found that the defendant had no prior history of juvenile delinquency or criminal convictions. See *id.* § 5-4.5-105(a)(8).

¶ 54    In discussing the circumstances of the offense (see *id.* § 5-4.5-105(a)(5)), the court found it relevant that the defendant told his classmates earlier in the day that he intended to kill his parents, that there was no indication of any altercation that evening, and that the defendant's parents were both asleep when he shot them. The court also considered the fact that the defendant took money from his father, then "drove all the way into Jonesboro," bought soda, and drove home

before calling anyone. The court explained that although the defendant may not have known that his mother was still alive when he left the house, by the time he returned "he would have had to have known \*\*\* that his mother was aspirating in her own blood." The court emphasized that despite this knowledge, the defendant did not call 9-1-1 or an ambulance, even anonymously. The court stated, "I didn't hear anyone put forth any evidence that when Uncle Gary or Cousin Pender got to the place \*\*\*, he was fraught with emotion." The court further noted that in his confession, the defendant stated that he confessed because he knew he would be caught, not because he felt remorse.

¶ 55    The court went on to consider additional factors. The court found that the crime was premeditated. The court considered whether the defendant was provoked to act, noting that if the abuse occurred, "then I can say that he was provoked to act against the father." However, the court then asked how much provocation was "enough," noting the changing views towards corporal punishment over the years. Ultimately, the court found that the killings were "too senseless" to be considered the product of provocation.

¶ 56    The court found that the defendant showed no remorse in 1995 when he pled guilty. Although at one point the court acknowledged that the defendant did express remorse by the time of his resentencing hearing, the court also noted that he demonstrated a "coolness" in court.

¶ 57    The court also considered whether the defendant inflicted prolonged pain or torture. The court stated that Betty's knowledge that her son was the person who had shot her must have caused her to suffer emotionally. In addition, the court stated, "I just can't get past the fact that Betty was left to aspirate in her own blood."

¶ 58    The court concluded by expressly finding that the defendant's conduct demonstrated irretrievable depravity or permanent incorrigibility. In reaching this conclusion, the court

emphasized the defendant's cool demeanor, the fact that he had no psychiatric diagnoses, and the fact that the defendant had opportunities to escape the alleged abuse without killing his parents. The court noted that the defendant had his own truck and that he had run away previously. The court vacated the original sentences and imposed new sentences of natural life imprisonment, to run concurrently.

¶ 59    On December 19, 2019, the defendant filed a motion to reconsider sentence. In pertinent part, he asserted that (1) the court "required thorough qualification of Ms. Mahabir's expertise in the field of social work" even though the rules of evidence are relaxed at sentencing hearings; (2) the court improperly struck portions of the mitigation report; (3) the court improperly injected his personal views into his findings of fact; (4) the court improperly interjected faith and religion into his findings; (5) the court inaccurately stated that some of the facts related to the circumstances of the offense were uncontroverted when they were in dispute; (6) the court improperly considered the statutory aggravating and mitigating factors set forth in sections 5-5-3.1 and 5-5-3.2 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2016)); (7) the court improperly weighed those factors against the mitigating factors applicable to juvenile defendants set forth in section 5-4.5-105 (*id.* § 5-4.5-105); and (8) the court improperly considered a factor inherent in the offense in aggravation. The motion was signed by attorney Sarah Sallen.

¶ 60    On February 21, 2020, the court held a hearing on the motion. Attorney Sallen and law student Emily Komp appeared with the defendant. Komp informed the court, "We've spoken to our client about the proceedings today, and at this time, we rest on our written motion." The court responded, "I cannot deny that after you sent the motion without noticing it up for hearing, that I thought maybe you wanted the court to just rule on the motion. This court believes that this case carries more gravity than doing it without a motion hearing."

20

¶ 61    The prosecutor indicated that he had not expected to present oral arguments. However, he went on to provide a summary of the arguments in the State's written response to the defendant's motion.

¶ 62    The court then inquired, "I do want to go back to the defendant's attorneys with regard to paragraphs 37 and 38, and I would like a full clarification on *** what exactly the accusation is about, regarding those two items." We note that paragraphs 37 and 38 contained the allegations that the court improperly interjected personal views, faith, and religion into his findings. Komp replied, "Your Honor, I don't have the complete transcript in front of me right now, and we are resting on our written motion at this time."

¶ 63    Before ruling on the motion, the court addressed those allegations, stating, "I am trying to recall what personal views I may have interjected into the hearing." The court took issue with this characterization, but then acknowledged that "a judge should not be thin-skinned about a situation like this." The court next stated, "Faith and religion, I do remember with regard to personal views and faith and religion that I noted about the defendant's grandmother, who I observed throughout the entire proceedings, *** that she took the whole situation as well as she was taking it." The court recalled that he stated at the hearing that it was difficult for him to understand how she could forgive the defendant for killing her daughter and "that she may have reached Nirvana." The court explained that he used that term "as a generic term to mean someone who had reached some level of perfection that none of us may be able to ever reach when it comes to love and forgiveness."

¶ 64    The court denied the defendant's motion to reconsider without providing further elaboration. This appeal followed.

21

¶ 65                                II. ANALYSIS

¶ 66    The defendant raises multiple issues. In challenging his sentences, he argues that (1) a discretionary sentence of natural life in prison was not authorized under the statutes in effect when he committed the murders; (2) the sentence violates *Miller* because the court did not adequately consider the mitigating features of his youth; (3) the court misstated key pieces of evidence and relied on these misstatements; (4) the court improperly relied on a factor inherent in the offense of murder as a factor in aggravation; and (5) the trial judge substituted his personal beliefs for the expert witness's opinion and analysis. The defendant further argues that he received ineffective assistance of counsel because (1) Ortiz and the law students who assisted him did not fully comply with the requirements of Rule 711 and (2) he was prejudiced by their performance when one of the supervising attorneys allowed one of the students to rest on the written motion to reconsider sentence during the hearing on that motion.

¶ 67    Before addressing the merits of these contentions, we note that the State argues that many of them are forfeited because the defendant either failed to raise them in his motion to reconsider or raised them in a nonspecific manner. However, forfeiture is a limitation on the parties, not on courts. *People v. Sophanavong*, 2020 IL 124337, ¶ 21. Here, the defendant has argued that he received ineffective assistance of counsel, in part due to the failure of the defense team to preserve these issues for our review. Because it is necessary to consider the validity of the underlying claims to evaluate the defendant's ineffective assistance of counsel argument and because the issues raised in this appeal are important, we choose to address all the defendant's claims on their merits.

¶ 68             A. Statutory Authority for the Natural Life Sentence

¶ 69    The defendant first asserts that the court erred in sentencing him to natural life in prison because there was no statutory authority for that sentence. We disagree.

22

¶ 70    Before discussing the defendant's specific contentions, a brief overview of the pertinent statutory provisions will be helpful. As stated earlier, the defendant chose to be sentenced under the laws in effect in 1992, when he committed the offenses. As we also discussed earlier, a sentence of natural life in prison was mandatory under the applicable statute for defendants convicted of murdering more than one individual. 1989 Ill. Rev. Stat., ch. 38, ¶ 1005-8-1(a)(1)(c). A sentence of natural life was also mandatory for defendants who were adjudicated as habitual criminals. *Id.* ¶ 1005-8-1(a)(2). A discretionary sentence of natural life was authorized if the court found that the murder was accompanied by brutal and heinous conduct indicative of wanton cruelty or if any of the aggravating factors for imposition of the death penalty were present. *Id.* ¶ 1005-8-1(a)(1)(b). Those factors included a conviction for murdering multiple victims (*id.* ¶ 9-1(b)(3)) or a finding that the murder was "committed in a cold, calculated and premeditated manner pursuant to a preconceived plan" (*id.* ¶ 9-1(b)(10)).

¶ 71    The defendant argues that none of these provisions authorizing a mandatory or discretionary life sentence were applicable to him. He correctly points out that he was not adjudicated a habitual criminal, thereby making section 1005-8-1(a)(2) inapplicable. He further argues that section 1005-8-1(a)(1)(c), mandating a natural life sentence for a defendant who kills more than one victim, was made inapplicable to juvenile defendants by *Miller*. Similarly, the defendant contends that because section 9-1(b) expressly applied only to a defendant who had reached the age of 18 at the time of the offense, he could not be sentenced to natural life in prison under section 1005-8-1(a)(1)(b) based on the presence of the aggravating factors listed in section 9-1(b). Finally, the defendant argues that he also could not be sentenced to a discretionary natural life sentence under section 1005-8-1(a)(1)(b) based on a finding that the murder was accompanied

23

by exceptionally brutal behavior indicative of wanton cruelty because the court never explicitly made that finding. We are not persuaded.

¶ 72    We first consider the defendant's argument that *Miller* made section 1005-8-1(a)(1)(c), mandating natural life in prison for defendants convicted of multiple murders, inapplicable to him because he was a juvenile when he killed his parents. The *Miller* Court discussed at length the need for sentencing courts to be able to consider the mitigating characteristics of youth before sentencing a juvenile murder defendant to natural life in prison without the possibility of parole. See *Miller*, 567 U.S. at 473-79, 489. In *Montgomery v. Louisiana*, the Court held that *Miller* announced a substantive rule of constitutional law that must be applied retroactively. *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016). The Court further held that converting a life sentence without the possibility of parole to a life sentence with the possibility of parole is sufficient to remedy a *Miller* violation retroactively. *Id.* Illinois courts generally require a remand for resentencing. See, *e.g.*, *People v. Buffer*, 2019 IL 122327, ¶ 49; *People v. Davis*, 2014 IL 115595, ¶ 43. However, the *Montgomery* Court's holding—which allows juveniles to remain sentenced under statutes like the one at issue here—indicates that the constitutional flaw lies not with application of the underlying sentencing statutes, but rather, with their mandatory effect. See also *Davis*, 2014 IL 115595, ¶ 43 (emphasizing that "*Miller* does not invalidate the penalty of natural life without parole for multiple murders, only its *mandatory* imposition on juveniles" (emphasis in original)). For these reasons, we find that section 1005-8-1(a)(1)(c) provided statutory authority for the defendant's natural life sentence even though its application to him could not be mandatory.

¶ 73    We next consider the defendant's contention that he could not be sentenced to a discretionary sentence of natural life in prison based on the presence of death penalty factors. We disagree for two reasons.

24

¶ 74    First, the express terms of the two statutory provisions lead us to this conclusion. Section 9-1(b), the provision containing the aggravating factors for the death penalty, stated as follows: "A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if" any of the aggravating factors set forth in the statute were present. 1989 Ill. Rev. Stat., ch. 38, ¶ 9-1(b). Section 1005-8-1(a)(1)(b), by its express terms, provided that "if the court finds that *** any of the aggravating factors listed in subsection (b) of Section 9-1 of the Criminal Code of 1961 are present, the court may sentence the defendant to natural life imprisonment." *Id.* ¶ 1005-8-1(a)(1)(b). The statute did not contain any provisions limiting its application to adult defendants. Thus, reading the two statutes together, it is clear that while section 9-1(b) limited the imposition of the death penalty to defendants who were adults when they committed the offenses at issue, no such restriction applied to the imposition of natural life sentences based on the same aggravating factors.

¶ 75    Second, as the defendant acknowledges, two Illinois cases have interpreted these statutes as authorizing discretionary life sentences based on the death penalty factors for juvenile defendants. See *People v. Abernathy*, 189 Ill. App. 3d 292, 316-17 (1989); *People v. Walker*, 136 Ill. App. 3d 177, 181-82 (1985). He argues, however, that these cases are distinguishable because the sentencing courts there expressly found that the murders were accompanied by exceptionally brutal behavior indicative of wanton cruelty, which provided an independent basis for the sentences that does not exist in this case. See *Abernathy*, 189 Ill. App. 3d at 316; *Walker*, 136 Ill. App. 3d at 182. We note parenthetically, that although the court did find that the defendant caused prolonged suffering to his mother, Betty, the court did not expressly find that the murders were

accompanied by exceptionally brutal conduct indicative of wanton cruelty. We find the defendant's argument unavailing.

¶ 76     In *Abernathy*, the defendant was convicted of murder, aggravated criminal sexual assault, and armed robbery. *Abernathy*, 189 Ill. App. 3d at 295. He was 17 years old when he committed the offenses at issue. *Id.* at 317. The trial court expressly found that the murder was accompanied by brutal conduct indicative of wanton cruelty. *Id.* at 316. On appeal, the defendant argued that the court erred in sentencing him to natural life in prison. *Id.* at 315. In rejecting this claim, the appellate court first considered the interplay between the two statutes at issue in this case. The court explained that because one of the aggravating factors listed in section 9-1(b) was that the murder took place during the commission of another felony, the natural life sentence was authorized by section 1005-8-1(a)(1)(b). *Id.* Only after reaching this conclusion did the court go on to state that the trial court's finding of brutal behavior indicative of wanton cruelty provided "*another* basis for imposition of a life sentence." (Emphasis added.) *Id.*

¶ 77     *Walker* likewise involved a murder committed during the course of another felony and a finding of exceptionally brutal conduct indicative of wanton cruelty. *Walker*, 136 Ill. App. 3d at 182. There, the defendant raised the precise argument the defendant raises here. That is, he argued that the trial court was required to find that he was at least 18 years old at the time of the murder before it could consider whether any of the death penalty factors were present. *Id.* The appellate court rejected this argument, explaining that no "age requirement has been provided for the imposition of a life sentence." *Id.* Thus, we find no support for the distinction the defendant asks us to draw. For these reasons, we conclude that the defendant's sentence was authorized by statute.

¶ 78                              B. Compliance With *Miller*

¶ 79     The defendant next contends that, although the court held a resentencing hearing, its decision to impose a sentence of natural life in prison does not comport with the requirements of *Miller*. We are not persuaded.

¶ 80     In *People v. Holman*, 2017 IL 120655, the Illinois Supreme Court considered the question of how best to implement the *Miller* holding in Illinois. The *Holman* court held that sentencing courts must specifically consider a series of factors associated with youth that have come to be known as the "*Miller* factors." *Id.* ¶¶ 42-44. Those factors include (1) the defendant's chronological age at the time of the offense along with any evidence that he was particularly immature, impetuous, or unable to appreciate risks and consequences; (2) the defendant's family and his home environment; (3) the degree of the defendant's participation in the offense and any evidence that peer pressure or familial pressure played a role; (4) the extent to which the defendant was unable to deal with police and prosecutors and any limitations on his capacity to assist his attorneys; and (5) the defendant's potential for rehabilitation. *Id.* ¶ 46 (citing *Miller*, 567 U.S. at 477-78). Our legislature has enacted section 5-4.5-105 of the Unified Code of Corrections, which mandates that courts sentencing juvenile defendants consider these and other factors in addition to the factors applicable to all defendants. 730 ILCS 5/5-4.5-105(a) (West 2016).

¶ 81     As we have already discussed at length, the court heard substantial evidence concerning these factors, and the court expressly addressed them in its detailed ruling from the bench. The defendant acknowledges as much, and he further acknowledges that the court expressly found his conduct to have been the result of irretrievable depravity and permanent incorrigibility. The defendant argues, however, that the court failed to fully appreciate the "uniquely mitigating" circumstances of his youth, his impetuosity, and his family and home environment. He further

argues that in light of these circumstances and the evidence of rehabilitation in the years since he committed the offense, his crime "reflects transient immaturity," and the natural life sentence imposed by the court is thus unconstitutional under *Miller* and its progeny. See *Montgomery*, 577 U.S. at 211. We disagree.

¶ 82    We first observe that there was conflicting evidence concerning the defendant's home life—particularly the extent of any abuse that occurred. Both Gary Gibbs and Bradley Pender testified that they spent a significant amount of time with the defendant throughout his childhood and that they never witnessed any abuse or saw signs of injuries. Similarly, there was conflicting evidence concerning the defendant's level of maturity and competence. While there was some evidence that the defendant was less mature than the average 17-year-old and did poorly in school, there was also evidence that he had never been diagnosed with any psychological disorders or developmental disabilities.

¶ 83    The defendant complains that the court found that he was no more impetuous than his cousins, based partly on the court's observations of the defendant in the courtroom. He correctly notes that the question was his impetuosity in 1992 at the age of 17, not his impetuosity in 2019 as a middle-aged man. However, the court also based this finding on the statements of the defendant's family members about his youth. Moreover, there is nothing in the record to indicate that the defendant was particularly impetuous when he decided to kill his parents. Significantly, his own account of the events in his statement to police contains evidence of premeditation. The defendant told Nagle and Patterson that he "had decided to kill [his] parents" due to his fear of getting in trouble over his grades. Although he did not specify when he made that decision, he gave an account that included methodical preparations such as doing laundry, packing to run away, retrieving his father's gun, obtaining ammunition, and loading the gun. He also described taking

28

calculated steps after the shootings to make it appear that his parents were shot while he was away from the house.

¶ 84 The evidence concerning the defendant's rehabilitative potential likewise cut both ways. As the court recognized, there was some evidence that the defendant eventually expressed remorse for his crimes, and there was evidence that he had made some efforts at rehabilitation by obtaining his GED and a culinary certificate while in prison. However, the court was free to weigh these factors against his observation of the defendant's cool demeanor, the evidence that the defendant incurred many infractions during his first decade in prison, and the circumstances surrounding the offenses. *Miller* requires that courts consider evidence concerning the mitigating features of youth. Although we emphasize that courts must give serious consideration to this evidence and may not simply pay it lip service, the record in this case indicates that the court carefully considered significant evidence concerning the *Miller* factors.

¶ 85                          C. Misstatements of the Facts

¶ 86 The defendant next argues that the court erroneously relied on misstatements of the facts surrounding the offenses. We will consider each of the misstatements he contends that court made.

¶ 87 First, the defendant points to the court's finding that the defendant caused prolonged suffering to his mother, Betty, both because she was left to aspirate in her own blood and because it must have caused her emotional pain to know that her son had shot her. He notes that the autopsy report indicates that Betty was likely rendered unconscious immediately by the shots and remained comatose throughout her hospital stay. He contends that this evidence shows that she was never aware that her son shot her, thus contradicting the court's finding that she experienced emotional pain. He further argues that there was no evidence that Betty felt any physical pain. The defendant also challenges the court's related finding that he was indifferent to his mother's suffering. He

29

asserts that he called his uncle, Gary, as soon as he discovered that his mother was still breathing, and he argues that this was a course of action chosen because of his "age, lack of maturity, learning difficulties, and very poor problem-solving skills." We are not persuaded.

¶ 88     We acknowledge that the court's comments regarding Betty's mental suffering were speculative at best. However, we find that the record contained evidence to support the finding that she suffered physically and the finding that the defendant acted with indifference to that suffering. Gary Gibbs testified that he saw Betty trying to breathe and "blowing bubbles in her own blood." Pender likewise testified to seeing Betty trying to breathe. The defendant told police that at some point after returning home he noticed that his mother was still breathing. Contrary to the defendant's argument, he did not tell police that he called his uncle immediately after noticing that Betty was breathing. Rather than calling 9-1-1 for immediate assistance, he called his uncle. Moreover, rather than staying with his mother and attempting to render aid or comfort, he waited outside. This evidence was sufficient to support the court's findings.

¶ 89     The defendant next complains that the court erroneously stated that there was no evidence that the defendant was "fraught with emotion" when Gary Gibbs or Bradley Pender arrived at the house. At the resentencing hearing, Pender described the defendant as "slumped over" and "kind of crying." This description indicates some distress, but not that the defendant was "fraught with emotion." At the hearing on the motion to suppress, Nagle described the defendant's emotional state as "nervous" but not "physically upset" and not crying. It is also worth reiterating that the defendant went through a series of steps in an effort to—in the defendant's own words—"hide what [he] did to [his] parents."

¶ 90     Finally, the defendant complains that the court referred to the "undisputed fact" that the defendant told two classmates about the murder earlier in the day. As we discussed earlier, this

30

was presented as part of the factual basis for the defendant's plea. The defendant argues that the court erred in referring to it as an "undisputed fact" because he did, in fact, dispute it. We disagree. Although the defendant told Mahabir in 2019 that he did not remember telling any of his classmates about his plan to kill his parents 27 years earlier, he did not affirmatively deny doing so. In any case, we believe the defendant's own account of the events leading up to the shooting amply supported the court's finding of premeditation for the reasons we discussed earlier.

¶ 91                                        D. Factor Inherent in the Offense

¶ 92    The defendant next argues that the court considered a factor inherent in the offense as a factor in aggravation. As we stated earlier, the court explicitly found that the defendant's conduct caused harm. Because death is a necessary element of the offense of murder, harm to the victim is inherent in the offense. As the defendant correctly contends, a sentencing court may not consider a factor that is inherent in the offense as a factor in aggravation. *People v. Spicer*, 379 Ill. App. 3d 441, 467 (2007). Consideration of such factors constitutes a double enhancement because the legislature already took those factors into account when it decided upon the sentencing range for the offense. See *People v. Raney*, 2014 IL App (4th) 130551, ¶ 34. However, reversal is not warranted if we can discern from the record that the improper factor played an insignificant role in the court's decision and did not result in a harsher sentence than the court otherwise would have imposed. *People v. Brown*, 2019 IL App (5th) 160329, ¶ 19. Here, we do not believe reversal is required. The court provided a lengthy and detailed explanation of findings in ruling from the bench. While this factor was mentioned, the court did not focus on it or elaborate. It is also worth reiterating that the basis for imposing a natural life sentence was the fact that the defendant killed more than one individual, not the general aggravating factors.

31

¶ 93        E. Substitution of the Judge's Views for the Expert's Opinions

¶ 94    The defendant next contends that the trial judge abused his discretion by substituting his personal opinions and beliefs for the expert analysis offered by the defendant's expert witness. We disagree.

¶ 95    We first emphasize that the court did not wholly reject the opinions and analysis provided by the defendant's expert witness in her testimony and in the mitigation report. As discussed earlier, the court refused to strike portions of the mitigation report opining as to the effects of the abuse on the defendant's state of mind even though the court agreed to strike portions addressing the effects of long-term abuse on adolescent brain development. Mahabir specifically testified that she was not qualified to diagnose the defendant. Other portions of the report were stricken because the court found them to be irrelevant. We review these evidentiary rulings for an abuse of the trial court's discretion. We will not find an abuse of discretion unless we find the court's decisions to be "arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 10. Applying this standard, we find no abuse of discretion.

¶ 96    It is important to reiterate that the court accepted Mahabir as an expert in social work. The defendant argues that the court's questioning of Mahabir about her qualifications was "alarming" and showed that the court did not understand her field of expertise. The defendant points to two questions asked by the court in ascertaining Mahabir's qualifications. As discussed earlier, in asking about the qualifications for the position of forensic social worker, the court asked Mahabir if she received specialized training where she earned a certificate that she could "hang on the wall or put in [her] scrapbook," and in asking whether that job title was unique to Mahabir's workplace,

32

the court offered the following analogy: "you can work for Hyatt Regency and be called an 'events specialist manager' but you're a party planner." We reject the defendant's claim.

¶ 97    While we acknowledge the dismissive tone in the phrasing of these questions, we believe the defendant takes them out of context. As we discussed earlier, the court questioned Mahabir about whether her job title was unique to her workplace or a position that any social worker can have. She explained that it was a recognized title within the field of social work, and the court accepted her answer. Read in context, we find that the court's reference to the position of "party planner" was nothing more than an analogy to clarify the question. As we also discussed earlier, the court questioned Mahabir about the specific training she underwent to become a forensic social worker and mitigation worker. She stated that the only training required was that needed to become licensed as a social worker. Again, the court's question regarding the requirement of specialized training could have been worded more artfully, but the witness clearly understood the question as simply asking about her specific training. We believe that the defendant's assertion that the court required Mahabir to prove her credentials with a scrapbook mischaracterizes the exchange. We find no abuse of discretion in the court's ruling. See *Doe v. Chand*, 335 Ill. App. 3d 809, 821 (2002) (explaining that trial court rulings on an expert witness's qualifications are reviewed under the abuse of discretion standard).

¶ 98    The defendant next contends that the court erroneously relied on his own personal opinions, including "myths about domestic violence." As an example, the defendant points to the judge's comments concerning cases he had seen involving "battered families" in which a mother stayed with an abusive father. The court stated, "I cannot wrap my mind around it," that "it defies all logic," and that there "must be some psychology that causes a parent" to stay with an abusive

33

spouse. The court also stated that it is a "paradox" that Betty left Richie, but later reconciled with him.

¶ 99    It is important to recognize that these comments indicate that the court was well aware that abused spouses often stay with their abusers—something the trial judge noted he had seen many times. More importantly, however, we must reiterate that the court was presented with conflicting evidence as to the existence and extent of the abuse. As we mentioned earlier, Mahabir and Flynn relied on interviews with the defendant and three members of his mother's family. Members of the defendant's father's family vehemently denied the allegations of abuse, and the picture of pervasive abuse painted by the defendant in his interviews with Mahabir and Flynn was at odds with the testimony of Gary Gibbs and Bradley Pender that they never saw the defendant with injuries indicative of abuse. The court, as finder of fact, was not required to accept the defendant's version of events.

¶ 100   The defendant also complains that the trial judge "repeatedly analogized to his own life" in ruling from the bench. He first points to the statement the judge made prior to ruling, in which he observed that "at one time" the defendant's family appeared to be "a great big, wonderful country family," something the judge noted he may have "personally experienced." As we discussed earlier, however, this statement was made before the court began ruling, and it addressed the rift between Betty's side of the family and Richie's side of the family. The defendant also points to statements the judge made concerning evidence that the defendant once ran away from home and evidence that he occasionally did not want to return home from his grandparents' house. The defendant also highlights the court's statements concerning attitudes towards corporal punishment in the 1960s and 1970s. Courts must base their decisions on the evidence before them rather than on "private investigation *** or *** private knowledge." (Internal quotation marks

34

omitted.) *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001). However, sentencing judges are not required to ignore or refrain from commenting on their own background and experience. "Indeed, it is precisely that experience that grounds the decision in a particular case in the value system of the community." *People v. Tye*, 141 Ill. 2d 1, 23 (1990). These isolated comments and illustrations from the court's lengthy and detailed explanation of the sentencing decision do not demonstrate that the court considered improper evidence or ignored the defendant's expert witness's analysis.

¶ 101   Finally, the defendant points to the court's statements that he could not understand how the defendant's maternal grandmother could forgive the defendant for killing her daughter. We do not believe this statement had any bearing on the court's ruling.

¶ 102                                   F. Failure to Comply With Rule 711

¶ 103   The defendant next argues that he was denied the effective assistance of counsel because the law students representing him failed to comply with the requirements of Rule 711 in three ways. First, Margaret Shadid was permitted to make arguments on his behalf before she was licensed under Rule 711. The defendant correctly points out that because she did not yet have her license, she was not authorized to provide legal services. See Ill. S. Ct. R. 711(e)(1). Second, although the defendant confirmed on the record that he understood that the law students on his legal team were not lawyers and that he agreed to allow them to represent him, no written consent to their representation was filed with the court. See Ill. S. Ct. R. 711(c)(2)(i). Written consent must be obtained and filed with the court before a student is authorized to perform legal services under Rule 711. *In re Denzel W.*, 237 Ill. 2d 285, 294 (2010). Finally, two of the students, Michael Podgurski and Emily Komp, appeared for the defendant at a telephonic status conference. Although they were supervised by their professor, Hugh Mundy, Mundy is not licensed to practice law in Illinois, and lead counsel Damian Ortiz was not present at that conference. See Ill. S. Ct. R.

35

711(c)(2)(iii) (mandating that in cases involving a possible prison sentence, students certified under Rule 711 may only make arguments if supervised by a licensed attorney who is present).

¶ 104   Noncompliance with Rule 711 is significant because the sixth amendment right to the assistance of counsel requires representation by " 'a duly licensed and qualified attorney.' " *Denzel W.*, 237 Ill. 2d at 296 (quoting *People v. Cox*, 12 Ill. 2d 265, 269 (1957)). Although law students may be authorized to perform legal services under Rule 711, a student who does not comply with the requirements of the rule is not "counsel" for purposes of the constitutional right to counsel. *Id.* If a defendant is not provided with counsel during a critical stage of criminal proceedings, he need not demonstrate prejudice to be entitled to reversal. *People v. Vernon*, 396 Ill. App. 3d 145, 152-53 (2009). Put differently, the two-pronged *Strickland* test (see *Strickland v. Washington*, 466 U.S. 668 (1984)) applies only where a defendant is, in fact, represented by counsel. *People v. Gamino*, 2012 IL App (1st) 101077, ¶ 16. Because the right to counsel includes the right to be represented by a qualified attorney, when a defendant is represented by an unlicensed or unqualified attorney, he "has not been provided with 'counsel' as defined by our supreme court and, consequently, a *Strickland* analysis is inappropriate." *Id.*

¶ 105   The defendant contends that, because the law students representing him failed to comply with the requirements of the rule, they were not "counsel" for sixth amendment purposes. He further contends that, as a result, he was completely deprived of the assistance of counsel and is therefore entitled to the reversal of his sentence without having to meet the requirements of *Strickland*. We reject this claim.

¶ 106   In *Denzel W.*, our supreme court held that, as we have just discussed, a law student who fails to comply with the requirements of Rule 711 does not qualify as "counsel" for purposes of the sixth amendment right to counsel. *Denzel W.*, 237 Ill. 2d at 296. The court stated, however,

36

that this fact alone does not end the inquiry. *Id.* There, as here, the defendants "were not represented by law students alone"; they were also represented by licensed attorneys who were "actively involved" in representing the defendants. *Id.* at 296-97. The court explained that "[t]he presence of the licensed attorney, who certainly is counsel for constitutional purposes, is not somehow 'canceled out' by the law student's participation, even if the law student has not complied with Rule 711." *Id.* at 297. The court therefore held that if a student is properly supervised by an attorney who "remains responsible for the representation, as Rule 711 requires," the defendant has not been denied his sixth amendment right to counsel. *Id.* at 297-98.

¶ 107 The supreme court qualified this holding in two important respects. First, the court emphasized that "where the defendant is entitled to counsel but the 711 law student appears alone in violation of the rule, the defendant clearly has been denied counsel." *Id.* at 298. Second, even where the supervising attorney is present in court as required, he or she "does not satisfy his or her obligation under Rule 711 merely by being physically present." *Id.* Instead, the supreme court held that "where the attorney's supervision of a 711 law student is insufficient in quality, nature, or duration," his or her representation may amount to ineffective assistance of counsel under the *Strickland* test. *Id.* The court further explained that, in such cases, "the supervising attorney's performance must be evaluated as a whole under *Strickland*." *Id.* at 299.

¶ 108 With these principles in mind, we turn our attention to the defendant's allegations concerning the representation he received from the 711 students in this case. We will first consider his claim that Podgurski and Komp represented him without supervision by a licensed attorney during a telephonic status conference.

¶ 109 We note that the record does not contain either a transcript or bystanders report of the conference. However, we are able to glean information about what occurred through an October

37

7, 2019, motion filed by attorney Ortiz and an October 10, 2019, motion hearing. In Ortiz's motion, he alleged that he had been unable to participate in the telephonic status hearing on September 27, during which the defense made an oral motion to continue the resentencing hearing to provide more time for the mitigation experts to conduct their investigation. Ortiz further alleged that the court directed the defense to file a written motion to continue, which they filed later that day, and that the court set the motion to continue for a hearing on October 10. Ortiz alleged that he was not available on October 10 and that Mundy was "not a clinician or otherwise able to supervise the students in open court." The motion therefore requested either a one-week continuance of the October 10 hearing or, alternatively, that Ortiz be permitted to appear by videoconferencing.

¶ 110    However, Ortiz did appear in court for the hearing on October 10, along with Podgurski, Komp, and Mundy. Although an additional attorney, Sarah Sallen, later appeared on behalf of the defendant, Ortiz indicated at the hearing that he and Mundy were the only attorneys working on the defendant's case with the Pro Bono Clinic, and Mundy told the court that he supervised the students during the September 27 telephonic status hearing. After hearing arguments on the motion to continue the resentencing hearing, the court denied it. The court stated that the mitigation experts had sufficient time to conduct their investigation and prepare their report.

¶ 111    The defendant is correct that he did not have the assistance of counsel during the telephonic status hearing. Rule 711 provides that "in proceedings challenging sentences of imprisonment, *** the student *** may participate in pretrial, trial, and posttrial proceedings as an assistant of the supervising member of the bar, who shall be present and responsible for the conduct of the proceedings." Ill. S. Ct. R. 711(c)(2)(iii). The students were not supervised by a member of the Illinois bar who was present during the call. It is important to emphasize, however, that the sixth amendment guarantees the right to counsel only at all critical stages of the proceedings. See

38

*Vernon*, 396 Ill. App. 3d at 153. A critical stage is one where the defendant may waive or assert constitutional rights (*People v. Lindsey*, 201 Ill. 2d 45, 56 (2002)) or where the " 'substantial rights of a criminal accused may be affected' " (*Vernon*, 396 Ill. App. 3d at 153 (quoting *Mempa v. Rhay*, 389 U.S. 128, 134 (1967))). The defendant argues that the status hearing was a critical stage "where counsel attempted to address the key issue of additional time to complete the mitigation investigation." However, the status hearing did not provide an opportunity for the defendant to assert or waive any constitutional rights and the court did not make any substantive rulings. Even if we were to accept the defendant's implicit contention that a motion for a continuance can be deemed a substantive ruling that affected constitutional rights, the court did not hear arguments or rule on that motion until a later, in-person hearing at which Ortiz—a licensed attorney—was present. We thus reject the defendant's contention that Ortiz's failure to participate in the telephonic status hearing requires reversal.

¶ 112   We next consider the defendant's arguments concerning the lack of written consent and the fact that Shadid was permitted to present arguments on his behalf prior to being certified under Rule 711. The defendant acknowledges that, as we have already discussed, failure to obtain and file his written consent with the court does not amount to a *per se* denial of the right to counsel. See *Denzel W.*, 237 Ill. 2d at 299. He argues, however, that he is not required to demonstrate prejudice or satisfy the *Strickland* test because Ortiz's "failure to comply with Rule 711 in multiple ways in multiple proceedings denied [the defendant] his right to counsel." We disagree. Our supreme court has specifically held that *Strickland* provides the proper framework for evaluating the performance of an attorney supervising law students. *Id*. We will therefore consider his claims under that test.

39

¶ 113                           G. Ineffective Assistance of Counsel

¶ 114   Under *Strickland*, a defendant must show both that counsel's performance was deficient

and that he suffered prejudice as a result. *Strickland*, 466 U.S. at 687. To satisfy the first

requirement, he must demonstrate that counsel's representation "fell below an objective standard

of reasonableness." *Id*. at 687-88. To satisfy the second requirement, the defendant must establish

prejudice, which requires him to demonstrate "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Because a defendant must satisfy both parts of the *Strickland* test, we may resolve claims of

ineffective assistance based solely on a defendant's failure to demonstrate prejudice. *People v.*

*Haynes*, 192 Ill. 2d 437, 473 (2000). Applying these principles, we reject the defendant's

contention that he received ineffective assistance from Ortiz, Sallen, and the students who assisted

them in representing him.

¶ 115   The defendant argues that he was prejudiced by Ortiz's "lackluster supervision." He cites

various examples, asserting that the defense failed to present testimony at the resentencing hearing

from potential witnesses referenced in a report attached to the postconviction petition; that Ortiz

failed to ensure that the 711 students supported their oral arguments with citations to applicable

law on one occasion; and that he allowed "another attorney [Sallen] who had not previously

appeared with [the defendant] to file the non-specific motion to reconsider sentence and appear at

the hearing on that motion where she failed to properly supervise the student" who presented

arguments. Apart from his contention regarding the motion to reconsider sentence, the defendant

does not explain how he was prejudiced by any of these asserted inadequacies in Ortiz's

40

performance. Thus, we need not address those assertions. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 116    The defendant argues that the handling of the motion to reconsider his sentence was prejudicial because the written motion was so lacking in factual detail that it was insufficient to preserve his claims of error for appellate review. See *People v. Brasseaux*, 254 Ill. App. 3d 283, 290 (1996). He further argues that because the written motion was inadequate, it was important that the student arguing on his behalf at the hearing to do more than stand on the written motion, particularly "where the trial court directly asked the defense to clarify their contentions of error." He contends that it was also incumbent upon the supervising attorney to correct the error.

¶ 117    We agree with the defendant that the written motion was inadequate due to the lack of specificity in most of its allegations. Although we note that the court's question appeared to be a reaction to the accusation that he had interjected personal beliefs and religion into the hearing rather than a general request for clarification of the issues, we also agree that failing to provide additional argument at the hearing was problematic. However, this court has considered the claims of error raised in the defendant's motion to reconsider that he also raised in this appeal, and we have found them to be without merit. Because the arguments lacked merit, we find that the defendant has failed to establish prejudice as required under *Strickland*. For these reasons, we reject both his claim of ineffective assistance of counsel and his claim that he was wholly denied the assistance of counsel due to the defense team's failure to comply with Rule 711.

¶ 118    We wish to emphasize that, although we reject the defendant's claims concerning his representation, we do not condone the defense team's multiple violations of the requirements of Rule 711. Illinois Supreme Court rules have the force of law and are not merely suggestions. *People v. Houston*, 226 Ill. 2d 135, 152 (2007). Compliance with these requirements is important.

41

*Id.* As our supreme court has emphasized, "it is incumbent upon" licensed attorneys who allow law students to assist them pursuant to Rule 711 to ensure that the students comply with the requirements of all applicable supreme court rules, including Rule 711. *Denzel W.*, 237 Ill. 2d at 293-94. Although we are troubled by counsel's failure to ensure compliance in this case, we nevertheless affirm the court's sentence pursuant to *Denzel W.* because the defendant was not wholly deprived of the assistance of counsel at any critical stage of the proceedings and he has failed to satisfy the *Strickland* test, as required.

¶ 119                                 III. CONCLUSION

¶ 120   For the foregoing reasons, we affirm the judgment of the trial court sentencing the defendant to natural life in prison.


¶ 121   Affirmed.